[No. G014942. Fourth Dist., Div. Three. Mar. 24, 1997.]

JOHN HIGGINS et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA, Defendant and Respondent.

**180**

Girardi & Keese, James B. Kropff and Brian C. Gonzales for Plaintiffs and Appellants.

William C. McMillan, Anthony J. Ruffolo, Carol Quan, Christopher Hiddleson and Rene Judkiewicz for Defendant and Respondent.

**SONENSHINE, Acting P. J.**—John Higgins and Stacy Higgins appeal from a judgment in favor of the State of California (the state) in an auto accident/personal injury action. The court granted the state's motion for summary judgment based on design immunity. (Gov. Code, § 830.6.) (All statutory references are to the Government Code.) The Higgins contend the state failed to establish all the elements of a complete defense.

FACTUAL AND PROCEDURAL BACKGROUND

On the morning of November 22, 1990, John and Stacy Higgins's vehicle, traveling southbound at 65 miles per hour in the carpool lane of the I-405 freeway, collided with a vehicle attempting to merge. The Higginses' car, impacted at the right front bumper and fender, ricocheted across the center median strip and into the northbound lanes of the freeway, where it was struck again before coming to rest on the east shoulder. John and Stacy (collectively Higgins) sustained injuries in the accident.

In September 1991, Higgins filed a complaint for damages, naming the owners and drivers of the other two vehicles and various governmental entities, including the state's Department of Transportation (Caltrans). Higgins alleged the state's liability for creating a dangerous condition of public property because (1) there was no median barrier separating the northbound and southbound traffic; (2) the road shoulders were too narrow: and (3) the 55 miles per hour speed limit was unreasonably low for the area.[1]

In its answer generally denying the allegations of the complaint, the state asserted the affirmative defense of statutory design immunity from liability for damages, alleging, "Any and all acts or omissions . . . which allegedly created the condition of property . . . were in accordance with reasonably approved plans, specifications and designs of construction of, or improvement to, public property."

In June 1993, the state moved for summary judgment based on design immunity. Its separate statement of undisputed material facts recited, "Interstate Route 405 at the accident location is a north-south freeway with four twelve-foot wide lanes on either side. There are two carpool lanes at the location, in either direction. On the southbound side, the two lanes transition into one, with an additional area for merging traffic. [¶] . . . The north and southbound lanes of travel are divided by a median area composed of paved and unpaved sections. [¶] . . . The median area is more than 46 feet wide. [¶] . . . There is no median barrier at the location where the subject accident occurred. [¶] . . . The original design plans for the [subject] section of the

---

[1]The complaint alleged, in pertinent part, "[D]efendants . . . negligently constructed, maintained, repaired, designed, controlled, engineered, planned and otherwise failed to keep the Roadway and adjacent property in a safe condition, and permitted a dangerous condition to exist. Such improper actions include, but are not limited to, the establishment of an unreasonably low speed zone in an area of heavy traffic which caused a general disregard of all posted speed zone signs by motorists, narrow lanes and shoulders, . . . failure to include a median or other divider separating northbound and southbound lanes of traffic, and failure to regulate traffic on the Roadway in general, all despite defendants' actual knowledge of the dangerous nature and condition of the Roadway and of the high incidence of traffic accidents which had occurred on the Roadway."

405 freeway . . . , dated January 1969, were approved in advance of construction by State highway engineers with the discretionary authority to so approve. [¶] . . . The design plans for the modifications . . . , dated July 1990, including the carpool lanes, were approved in advance of construction by State highway engineers with the discretionary authority to so approve. [¶] . . . The original design plans and the subsequent design plans for the subject freeway construction could reasonably have been approved. [¶] . . . No changes in physical conditions had occurred in the actual operation of the subject accident location as of November 22, 1990, since the design modifications were completed in July 1990. [¶] . . . The speed limit for the subject location, as posted, was 55 m.p.h. on November 22, 1990." The declaration of Richard N. Smith provided evidentiary support for these facts.

Smith attested to his civil engineering degree and certification as a traffic engineer, his considerable professional contributions in the field of highway safety, and more than 30 years' experience with Caltrans, including a 14-year stint from 1974 to 1988 as its chief of safety research. He stated, "I authored a report in 1977 on the status of median barriers, as used in California, within medians of 46-feet or wider. Based on the recommendations I made in that report, State of California policy was changed so as to limit median barrier placement, based on traffic volume and median-width characteristics alone, to medians less than 46-feet wide. Such a standard had existed prior to 1971, when the 46-foot standard was increased to 50-feet. Based on my study of accident experience after that change, the standard was changed back to the 45-foot level in 1978, where it has remained ever since."

Smith visited and inspected the accident site and studied the traffic collision report and freeway design plans. He noted the location was designed and built in the late 1960's. The plans for the project were approved by the district engineer, engineer of design, deputy district engineer and assistant state highway engineer. In addition, "[t]he project was confirmed in 1969 as having been built according to plan by the Resident Engineer." Design plans for construction modification were approved in February 1988 by the deputy director of transportation and the chief of the office of engineers. In July 1990, the modification project was confirmed by the resident engineer as having been built according to plan. Smith averred the subject median area, as designed and built, was "in conformance with design standard for medians." Because it was more than 46 feet wide, "it did not have, nor should it have had, a median barrier." Finally, in Smith's expert opinion, both the original design plans and the plans for the modifications, including the installation of carpool lanes, "could reasonably have been approved."

Opposing the state's motion, Higgins conceded the design plans for the modification construction were duly approved by proper authorities. However, Higgins maintained neither the original nor the modification plans could have been reasonably approved because of "1) . . . an unreasonably short taper of the carpool lanes to merge into one lane; 2) the high incidence of cross median accidents in the immediate vicinity . . . ; 3) CALTRANS' own requirement of a median barrier during [the construction project]; and 4) the unreasonableness of not having a median barrier where the area is just over the width warrant and a high volume of traffic travels at high speeds." Higgins further contended there had been changes in physical conditions after the design modifications were approved, in that a temporary median barrier in place during the construction phase was removed when the work was completed.

Higgins submitted the declaration of Harry J. Krueper, Jr., a civil and traffic engineer and accident reconstruction litigation expert. Krueper attested to his familiarity with "accepted practices utilized by engineers in designing, constructing, modifying, upgrading and maintaining most types of public [property]." He opined "no reasonable employee of the State of California could have adopted the Project Plans for construction . . . as approved in March 1989, . . . and no reasonable legislative body or other body could have approved [those] [p]lans." He based his opinion on the volume of traffic in 1990, "about 225 percent of the 1980 volume," constituting "a definite change of condition from the original design of the freeway." Noting the median was about 48 feet wide, Krueper admitted California's standards, calculated according to "volume/width criteria," require barriers only when the median is 45 feet or less in width. But, he added, the 50-foot width advocated by a national highway safety organization was safer.

Krueper attested to another hazardous condition—two carpool lanes merging into one, with a "far too short" four hundred fifty-foot tapering transition. He said, "By state standards, transitions on high-speed roadways should be sufficiently long so any weaving or merging can be done with reasonable ease." Reciting "a long-standing formula . . . used on both a national and a statewide [although not specifically California] basis," Krueper calculated the taper length should have been at least 660 feet for cars traveling at the posted speed of 55 miles per hour, but more realistically, 780 feet for cars predictably speeding. He added that under today's standards, although not specifically in California, "the normal transition is up to 1,500 feet in length, with a 1,000-foot minimum."

Moreover, Krueper stated, between June 1987 and November 1990, there were four cross-median accidents in the subject area, including the Higgins

incident. Two of those accidents, one involving a fatality, occurred before the project plans were approved. In Krueper's opinion, the Higgins accident was easy to foresee, and "[i]t [was] unreasonable [for the state] to have approved the construction plans." Krueper believed with the "volumes of traffic and the higher speeds," Caltrans was "playing 'Russian roulette'" when it constructed the median without a "positive barrier" section.

In its reply, the state submitted Smith's supplemental declaration stating, in relevant part, "Neither the design plans approved in the late 1960s nor the plans approved in 1988 . . . called for the placement of a median barrier. Therefore, the absence of a median barrier at the subject accident site is in conformity with the design plans, and it was reasonable to approve the design plans which did not include a median barrier."

After hearing the motion, the court granted summary judgment, finding as a matter of law the state had established a complete defense under section 830.6.

### DISCUSSION

### I

A public entity may be liable for negligently creating an injury-producing dangerous condition (§ 835, subd. (a)), or for failing to remedy such a condition despite having had notice and sufficient time. (§ 835, subd. (b).) But the state is not liable "for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor." (§ 830.6)

Section 830.6 design immunity is asserted as an affirmative defense in actions arising out of an alleged dangerous condition of public property. It is ordinarily raised on a motion for summary judgment or nonsuit; the court decides whether there is sufficient evidence to support it. (*Uyeno* v. *State of California* (1991) 234 Cal.App.3d 1371, 1376 [286 Cal.Rptr. 328].) It is error to submit the issue to a jury. (*Ibid.*)

■ In determining the sufficiency of the state's proof, the court "must bear in mind the rationale underlying the theory of design immunity. 'Basically, this defense is predicated upon the concept of separation of powers— that is, the judicial branch through court or jury should not review the discretionary decisions of legislative or executive bodies, to avoid the danger of "impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested." . . . Additionally, judicial economy underlies design immunity— forbidding a jury from reweighing the same factors considered by the governmental entity which approve[d] the design. . . .' " (*Ramirez* v. *City of Redondo Beach* (1987) 192 Cal.App.3d 515, 524-525 [237 Cal.Rptr. 505], citations omitted.)

■ If there is *any substantial evidence* supporting the reasonableness of the approved design, design immunity applies. This is true even though the plaintiffs present evidence of a design defect: "That a paid expert witness for plaintiff, in hindsight, found . . . the design was defective, does not mean, ipso factor, that the design was unreasonably approved." (*Ramirez* v. *City of Redondo Beach, supra*, 192 Cal.App.3d at p. 525.) "[A]s long as reasonable minds can differ concerning whether a design should have been approved, then the governmental entity must be granted immunity." (*Ibid.*)

We review for substantial evidence to determine "whether the [state] has met its burden of establishing as a matter of law all the elements of . . . design immunity.' [Citations.]" (*Uyeno* v. *State of California, supra*, 234 Cal.App.3d at p. 1376.)

## II

■ To prevail, the state had to show "(1) [a] causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; [and] (3) substantial evidence supporting the reasonableness of the design." (*Muffett* v. *Royster* (1983) 147 Cal.App.3d 289, 306 [195 Cal.Rptr. 73].) ■ Higgins contests the first and third elements.

*Causal Relationship Between the Plan and the Accident*

■ Causal relationship is proved by evidence the injury-producing feature was actually a part of the plan approved by the governmental entity: Design immunity is intended to immunize only those design choices which have been made. A case in point is *Cameron* v. *State of California* (1972) 7 Cal.3d 318, 326 [102 Cal.Rptr. 305, 497 P.2d 777], where superelevation around a curve constituted the dangerous condition causing plaintiffs to lose

control of their car. The plans showed many aspects of the roadway, but there was no evidence "the superelevation which was actually constructed on the curve . . . was the result of or conformed to a design approved by the public entity vested with discretionary authority." (*Id.* at p. 326.) The state thus failed to prove the causation element—that a discretionary decision was actually made regarding the dangerous condition which caused plaintiffs' accident. (*Ibid.*)

Higgins relies on *Cameron*, and other like cases which we need not discuss, in arguing the dangerous condition—absence of a median barrier— was not a design choice made by the approving body in 1988. The record is otherwise.

The state presented substantial evidence the design plans did, in fact, consider the matter. Smith attested that under state standards, barriers are not required in medians wider than 45 feet. Higgins's expert admitted the median was 48 feet wide. Smith stated, "As the median was more than 46-feet wide, it did not have, *nor should it have had*, a median barrier. *The subject location was in conformance with design standards for medians.*" (Italics added.) And he added, in his supplemental declaration, "Neither the design plans approved in the late 1960s nor the plans approved in 1988 . . . called for the placement of a median barrier. Therefore, the absence of a median barrier at the subject accident site is in conformity with the design plans, and it was reasonable to approve the design plans which did not include a median barrier."

Smith's declaration, together with the two sets of design plans—one showing the original construction in the late 1960's, the other the 1988 improvement project—constitutes substantial evidence the absence of a median barrier "was the result of or conformed to a design approved by the public entity vested with discretionary authority." (*Cameron* v. *State of California*, *supra*, 7 Cal.3d at p. 326.) No more was needed to establish a causative relationship between the plan and the accident.

*Reasonableness of the Design*

Higgins argues the state did not establish reasonableness of the design because it failed to counter Krueper's opinion the merging distance of the two carpool lanes into a single lane was "far too short." But a conflict in opinions about defect will not create a triable issue of fact. (*Muffett* v. *Royster*, *supra*, 147 Cal.App.3d at p. 307.) The state had only to present substantial evidence of the reasonableness of the approved design. (*Ramirez* v. *City of Redondo Beach*, *supra*, 192 Cal.App.3d at p. 525.)

It submitted the plans for freeway modification. Those plans called for re-striping to provide for two carpool lanes, transitioning into one, with an additional area to accommodate merging traffic. Higgins presented no evidence the plans departed from state standards in regard to the length of the merging lane. And Smith attested the plans were approved by at least four highway engineers on the way up through the chain of command. The fact of approval by competent professionals can, in and of itself, establish the reasonableness element. (See, e.g., *Ramirez* v. *City of Redondo Beach*, *supra*, 192 Cal.App.3d at p. 526.) Smith further stated the project conformed with the plan. He thus laid a foundation for his opinion the design could reasonably have been approved. This constitutes substantial evidence on the element of reasonableness of the design.

Citing *Levin* v. *State of California* (1983) 146 Cal.App.3d 410 [194 Cal.Rptr. 223], Higgins protests Smith's opinion about reasonableness is insufficient. But in *Levin*, the evidence showed the design plan did *not* conform to state guardrail standards *or* take into account an additional dangerous condition, excessive steepness of a slope. The court, noting the "silence of the state's experts" on those key issues, stated, "[T]he mere fact that an expert witness testifies that in his [or her] opinion, a design is reasonable, does not make it so." (*Levin* v. *State of California*, *supra*, 146 Cal.App.3d at p. 418.) *Levin* is patently inapt.

### III

■ Higgins contends there are triable issues of fact as to whether the "changed conditions" exception to design immunity applies. ■ The exception, found in section 830.6, is explained in *Compton* v. *City of Santee* (1993) 12 Cal.App.4th 591, 598 [15 Cal.Rptr.2d 660]: "Design immunity under section 830.6 is not perpetual but may be lost as a result of changed circumstances which subsequently render the improvement dangerous, if the public entity has received actual or constructive notice thereof. [Citation.] If the approved design becomes dangerous by reason of any change in conditions, and that fact is known to the public entity, the immunity will continue for only a reasonable period of time to allow the entity to obtain funds to carry out the remedial work of bringing the property back into conformity with a reasonable design or plan. [Citation.] Thus, there are at least two predicates to loss of design immunity: changed conditions and notice. [Citation.]"

■ Higgins asserts the cross-median accident history at the site, the increased volume of traffic and the presence of a median barrier during construction constitute evidence of changed circumstances defeating design immunity. We disagree.

As for the accident history, the state concedes there were two cross-median accidents in 1987, one in 1989, and Higgins's accident in 1990. (Obviously, the latter cannot be included as proof of constructive notice.) Krueper attested, "By the state's own standards, such a high incidence of cross-median accidents within a one-mile stretch of roadway within a three and one-half year period should have warranted an investigation concerning the placement of a median barrier." But Smith testified the accident rate was below the .50 ratio which, under state standards, would trigger an investigation. And despite Higgins's characterization of Smith's testimony as "convenient," it constitutes substantial evidence. We neither assess its credibility nor weigh it against Krueper's declaration or deposition testimony. Moreover, Higgins failed to show the accident rate was "statistically aberrant, i.e. unusual or excessive in some respect." (*Compton* v. *City of Santee, supra,* 12 Cal.App.4th 591, 599.) Thus, the data are meaningless.

Higgins next asserts increased traffic constitutes a changed circumstance mandating the placement of a median barrier and defeating design immunity. Krueper declared the traffic volume in the vicinity was two and one-half times greater in 1990 than it was in 1980. So what? Abstract numbers prove nothing. Smith declared the state standard for placement of median barriers was calculated with reference to traffic volume and width of the median, and the subject freeway plans, original and subsequent, conformed to the standard. Higgins's evidence did not controvert the state's evidence.

Moreover, even if the traffic increase constituted a changed condition, Higgins failed to show the state received actual or constructive notice the condition rendered the freeway, as designed, dangerous. (See *Compton* v. *City of Santee, supra,* 12 Cal.App.4th at p. 598 ["there are at least two predicates to loss of design immunity: changed conditions and notice"].) This failing is what distinguishes Higgins's case from *Baldwin* v. *State of California* (1972) 6 Cal.3d 424 [99 Cal.Rptr. 145, 491 P.2d 1121], where the alleged dangerous condition was lack of a left turn lane, and the state *knew,* for instance: There were thirteen accidents in a six-month period, seven of which were caused by attempts to make left turns; the intersection accounted for 14 percent of all traffic fatalities in the city; the injury-fatality rate was double the rate for the rest of the city; three area businesses had written to the state, describing serious accidents and requesting corrective action; and there had been a large increase in traffic since the roadway's construction in 1942. (*Id.* at pp. 428-429.)

Finally, the state's placement of a median barrier while construction was going on proves nothing about changed circumstances which would require placement of a permanent barrier. Smith explained, "The 'K' rail is a

temporary device used during the construction phase of a project, and . . . once the construction is completed, [the] 'K' rail is always removed, unless . . . incorporated into a pre-approved median barrier installation."

In summary, the state presented substantial evidence showing it was entitled to the complete defense of design immunity under section 830.6. The court would have erred had it not granted the motion for summary judgment.

The judgment is affirmed. The state shall recover its costs on appeal.

Crosby, J., and Rylaarsdam, J., concurred.