Filed 7/26/13

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RANDALL KEITH HAMPTON et al., | D061509 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2010-00101299-CU-PA-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Affirmed.

Thorsnes Bartolotta McGuire, John F. McGuire, Ian C. Fusselman and Benjamin I. Siminou for Plaintiffs and Appellants.

Thomas E. Montgomery, County Counsel, and Christopher J. Welsh, Deputy County Counsel, for Defendant and Respondent.

I.

INTRODUCTION

In November 2009, a vehicle that Randall Keith Hampton was driving collided with another vehicle at an intersection in Valley Center. Hampton and his wife sued the driver of the other vehicle as well as the County of San Diego (County).[1] The Hamptons brought claims against the County for dangerous condition of public property (Gov. Code, § 835 et seq.)[2] (fourth cause of action) and loss of consortium (third cause of action). The County moved for summary judgment on the ground that the Hamptons' claims were barred by the affirmative defense of design immunity. The trial court granted the County's motion. On appeal, the Hamptons claim that the court erred in granting the County summary judgment. We affirm.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Hamptons' complaint*

In their cause of action claiming dangerous condition of public property, the Hamptons alleged that the County had duties to "properly and safely plan, design, build, construct, operate, manage, maintain, direct, control, sign and supervise the roadways at the intersection of Cole Grade Road and Miller Road in the County of San Diego," and that the County breached these duties by "providing . . . inadequate sight distance for

---

[1]     The County is the only respondent in this appeal.

[2]     Unless otherwise specified, all subsequent statutory references are to the Government Code.

vehicular traffic approaching Miller Road from Cole Grade Road as well as for traffic pulling out from Miller Road onto Cole Grade Road . . . creating a defective and dangerous condition for motorists and traffic."  The Hamptons further alleged:

> "As a proximate result, Defendant ROBERT PAUL CULLEN [the other driver involved in the accident] was unable to see the plaintiff as the plaintiff pulled out from Miller Road onto Cole Grade Road and the plaintiff RANDALL KEITH HAMPTON was unable to see Defendant ROBERT PAUL CULLEN as defendant approached this intersection while driving on Cole Grade Road[,] causing their vehicles to collide at this intersection.  As a proximate result of Defendants' conduct, Plaintiff sustained the injuries and damages as herein alleged."

In a loss of consortium cause of action, the Hamptons alleged that Randall Keith Hampton had been unable to perform "necessary duties as a husband and the work and services usually performed in the support . . . of the family," due to the County's conduct.

B.    *The County's motion for summary judgment*

1.    *The County's motion*

The County filed a motion for summary judgment and/or adjudication on the ground that the affirmative defense of design immunity applied to bar the Hamptons' claims against the County.  In a supporting brief, the County noted that in order to establish the defense of design immunity, a public entity is required to establish three elements:  1) a causal relationship between the plan or design and the accident; 2) discretionary approval of the plan or design prior to construction; and 3) substantial evidence supporting the reasonableness of the plan or design.

3

The County contended that the causal connection element was met based on the Hamptons' allegation that the intersection at which the collision occurred constituted a dangerous condition. With respect to the discretionary approval element, the County stated that the County had approved plans for improvements to the intersection in 1995, prior to the construction of those improvements in 1998. Finally, the County argued that the declaration of Robert Goralka, a licensed engineer, demonstrated the reasonableness of the plans for the intersection. The County also maintained that the Hamptons would be unable to demonstrate changed conditions resulting in a loss of design immunity, arguing that the Goralka declaration "establishes that the physical configuration of the intersection was the same when this accident occurred as it was in 1998 when the improvement project was completed."

The County supported its motion with two "Road Review[s]"[3] pertaining to the intersection, engineering documents entitled "Plans for Construction of Cole Grade/Miller Road Interim Intersection Improvements [(Plans)]," and Goralka's declaration, among other items.

In his declaration, Goralka stated that he is the County's traffic engineer and that his current duties involved managing various aspects of traffic operations on County roads. Goralka further stated that a 1989 Road Review noted that the sight distance from Miller Road looking south on Cole Grade Road was less than desirable due to a "hump"

---

[3]    The Road Reviews were generated by the County's Department of Public Works and identified various traffic conditions near the intersection and offered recommendations for improving such conditions.

in Cole Grade Road. The Road Review recommended lowering the crest on Cole Grade Road south of the Miller Road intersection to obtain additional sight distance at the intersection.

Goralka stated that he had reviewed the Plans and noted the following with respect to their approval:

> "The[] [P]lans consist of road cross-section diagrams, profiles, and striping plans. . . . Prior to actual construction[,] the [Plans] were, on March 3, 1995[,] signed by David Solomon, a licensed civil engineer and traffic engineer who served as Deputy County Engineer and was in charge of the County . . . Design Engineering Section. As the person in charge of the County's Design Engineering Section, he had been delegated by the County Board of Supervisors, through the Director of the Department of Public Works, discretion and authority to approve plans such as [the Plans]. After the project was completed, 'as built' plans were approved and signed by John Bidwell, a licensed civil engineer who served as Senior Civil Engineer of the County's Design Engineering Section on April 13, 1998."

Goralka described the purpose of the Plans as follows:

> "The [Plans] called for the lowering of the crest on Cole Grade Road, just south of the Miller Road intersection. The effect of lowering the crest is to improve intersection sight distance for the users of westbound Miller Road who look to view northbound traffic on Cole Grade Road as they are preparing to enter the intersection. The 'as-built' plans confirm that the crest of Cole Grade Road was lowered by several feet. The plans called for widening of both Cole Grade and Miller Roads, at their intersection to accommodate a left turn pocket on both northbound and southbound Cole Grade Road for vehicles turning west, and east respectively onto Miller Road. The as-built plans confirm that this feature of the project was constructed."

With respect to the issue of sight distance at the intersection in the wake of the improvements, Goralka stated the following:

5

"I have reviewed the [1999 Road Review] regarding Cole Grade Road. . . . In this Road Review, which is after the intersection improvement project, the reviewer notes that sight distance for westbound traffic is not adequate from 10 feet behind the limit line on Miller Road at the intersection with Cole Grade Road. This is a measurement typically used in designing new roads, and it does not mean that the County failed to provide reasonable sight distance for existing, previously constructed roads such as the intersection of Miller Road and Cole Grade Road. My usual manner of gauging operational sight distance from a side street at an intersection such as this, and the manner I have usually seen used by those working for the County, is to measure back from the prolongation of the painted edge of [the] lane line, not the limit line. In this instance, the edge of the lane line is several feet in front of the limit line. As a practical matter, a driver on westbound Miller Road who creeps forward from the limit line but has not yet crossed into the oncoming travel lane is able to gain more sight distance to the left, looking for traffic on northbound Cole Grade Road. This results in 'operational' sight distance."

Goralka also stated that, in his opinion, the Plans are reasonable.

"The [Plans] are reasonable. The configuration of the intersection shown in the plans provides adequate operational sight distance for a driver who creeps forward from the limit line. Having viewed the site in person, I can say that the operational sight distance provided between westbound Miller Road and northbound Cole Grade Road is adequate. The plans did not achieve a more desirable amount of sight distance sought when a new intersection is being designed from scratch in an open area. But the project did achieve operational sight distance, which is a reasonable improvement when, as here, there are design constraints including roadways already in place that are near the crest of a hill and an embankment with existing utilities."

2.      *The Hamptons' opposition*

The Hamptons filed an opposition in which they argued that the County was not entitled to summary judgment based on the affirmative defense of design immunity because the County failed to establish as a matter of law the "discretionary approval" and

6

"reasonable design" elements of the defense.[4] The Hamptons based their opposition primarily on the contention that the Plans disregarded the County's "own methodology for measuring sight distance." In support of this contention, the Hamptons stated that the Plans failed to provide either adequate "design sight distance" or "operational sight distance."[5]

The Hamptons noted that although the parties agreed that the County's design sight distance standard had not been met,[6] the parties disputed whether the Plans achieved sufficient operational sight distance under County guidelines. The Hamptons maintained that in stating that operational sight distance at the intersection was adequate, the County's expert, Goralka, "fail[ed] to follow the County['s] protocol for measuring sight distance." The Hamptons argued that Goralka failed to base his calculation of operational sight distance on measurements derived "from the edge of the *pavement*" as

---

[4]  The Hamptons did not dispute that the County had established the first element of its design immunity defense, namely, the existence of a causal relationship between the Plans and the accident.

[5]  The Hamptons argued that "[t]he purpose of providing design sight distance is to allow a driver intending to enter the intersection with sufficient time to decide whether it is safe to enter." The Hamptons contended that "[t]he purpose of providing 'operational' sight distance is to allow a party sufficient time to perceive and then stop before impacting a vehicle in the intersection."

[6]  Although the County agreed that the design sight distance standard had not been met, the County contended that this standard applied only to the design of *new* intersections, and that operational sight distance standards applied to improvements made to *existing* intersections.

required under County protocol, and that he had instead improperly measured from "the edge of the *lane*."[7]

With respect to the discretionary approval element, the Hamptons argued that "the Plans are silent as to sight distance," and that the County thus failed to "provide[] evidence that the deviations from design standards . . . were approved or even considered." In addition, the Hamptons argued that any approval of the Plans was necessarily unreasonable in light of the fact that the plans deviated from County sight distance standards.

The Hamptons also argued that the County's failure to maintain the intersection had resulted in changed conditions that precluded the application of the County's design immunity defense. Specifically, the Hamptons maintained that plant growth along an embankment on Cole Grade Road south of Miller Road further reduced the already inadequate sight distance at the intersection provided for in the Plans.

The Hamptons supported their motion with various documents and the declaration of Edward Stevens, a licensed civil engineer who has significant traffic engineering experience. In his declaration, Stevens stated that an embankment runs along the east side of Cole Grade Road as it approaches Miller Road and that this embankment limits sight distance for westbound traffic on Miller Road looking south toward northbound traffic on Cole Grade Road. Stevens further stated that the Plans do not depict the

---

[7]     It is undisputed that since there is a difference of several feet between the edge of the pavement and the edge of the lane of traffic at the intersection at which the accident occurred, a sight distance measurement taken relative to the pavement edge yields less sight distance than one taken from the edge of the lane line.

embankment and that as a result, it is not possible to determine from the Plans the actual sight distance at the intersection. Stevens stated that although the County standard for design sight distance requires at least 550 feet of sight distance at the intersection and the County standard for operational sight distance requires at least 388 feet, actual design sight distance at the intersection was only 214 feet and operational sight distance was only 323 feet.

Stevens stated the following with respect to Goralka's declaration as to the adequacy of sight distance at the intersection:

> "The standards set out by the County of San Diego . . . require that design and operational sight distance be measured backwards from the prolongation of the curb or gutter line or edge of the pavement, not from the edge lane line. The Declaration of Robert Goralka suggests that satisfactory operational sight distance exists at the si[te]. However, Mr. Goralka does not use the standard adopted by the County of San Diego for measuring sight distance. Further, Mr. Goralka's methodology is not generally accepted in the traffic engineering community as an appropriate means of measuring design or operational sight distance."

Stevens contended that because of the lack of information pertaining to sight distance in the Plans, "the engineer approving the Plans could not have exercised discretionary approval of the sight distance." In addition, Stevens maintained that given the inadequacies in the Plans pertaining to sight distance, "there is no basis upon which a traffic engineer could have reasonably approved the Plans."

Stevens attached various documents to his declaration, including two County engineering drawings, numbered DS-20A and DS-20B. The drawings are marked, "San Diego County Design Standard[s]" and are entitled, "Clear Space Easement Type A" and

9

"Clear Space Easement Type B," respectively. The drawings appear to depict easements necessary to achieve adequate "corner sight distance"[8] at two different shaped intersections. Both documents also contain an identical table that lists the "minimum corner intersection sight distance" in feet for various "design speed[s]." The table states that for a design speed of 50 miles per hour (MPH), 500 feet of corner intersection sight distance is required, and that when the design speed increases to 60 MPH, 600 feet of sight distance is required.

Stevens also included a document that contains several tables. One table, entitled, " 'Corner' Sight Distance on Level Roadways," repeats the corner sight distance information discussed in the previous paragraph, and includes a notation that states the following: "Corner sight distance measured from a point on the minor road at least 10 feet from the edge of the major road pavement and measured from a height of eye of 3.5 feet on the minor road to a height of object of 4.25 feet on the major road. (See Count[y] . . . Public Road Standards Drawings DS-20A and DS-20B)." Another table is entitled, " 'Operational' Stopping Sight Distance on Level Roadways," and contains a note that states, "Operational [Sight] Distance Measured from a point on the minor road 8 feet from the edge of pavement. (Distance from the front of the vehicle to the driver's eye is nearly always 8 ft [citation].) Measured from a height of eye of 3.5 feet on the minor road to a height of object of 3.5 feet on the major road [citation]."

---

8     It appears from the record that the terms "design sight distance" and "corner sight distance" are used interchangeably.

3.      *The County's reply*

The County filed a reply in which it reiterated its argument that Goralka's declaration established the existence of discretionary approval of the Plans prior to construction.  With respect to the reasonableness of the Plans, the County argued that the fact that "experts disagree on the best approach to the sight distance problem" did not establish a lack of "substantial evidence to support the reasonableness of the approach actually followed by the County."

Specifically, the County argued that " 'operational' rather than 'design' criteria appl[y] to an intersection of existing roadways," such as the intersection at issue.  The County also contended, "The way that operational sight distance at this intersection was measured is consistent with the County's practices, where the edge of the lane used by oncoming traffic is several feet in front of the limit line, thereby allowing drivers on westbound Miller Road plenty of room to safely creep forward and look both ways before reaching the oncoming lane and crossing into the intersection."  The County further argued that when operational sight distance is measured in this manner, the Plans provide for adequate sight distance.  Finally, the County argued that any growth in plants on the embankment along Cole Grade Road did not constitute a relevant changed condition since even with such growth, the embankment does not reduce the operational sight distance of a reasonable driver who creeps forward beyond the limit line and checks for oncoming traffic prior to entering the intersection.

11

In support of its reply, the County lodged a portion of the deposition testimony of its retained expert, Arnold A. Johnson. In the deposition, Johnson testified that a County document entitled "Service Request Guidelines Si[ght] Distance at Intersection" states, "Sight distance is measured 8 feet back from the prolongation of the curb *or 8 feet back from an edge line*." (Emphasis added.) The County also lodged a portion of Stevens's deposition in which Stevens acknowledged that if Hampton had pulled his vehicle to a point forward of the limit line on Miller Road just before entering the lane of traffic on Cole Grade Road, "Cullen's vehicle would be within his view if it was within 550 feet of the intersection. . . ."

C.   *The trial court's ruling*

The trial court held a hearing on the motion. At the conclusion of the hearing, the court took the matter under submission. Four days later, the trial court issued an order granting the County's motion for summary judgment. The court ruled that the County had established its design immunity affirmative defense as a matter of law. In reaching this conclusion, the court reasoned in part:

> "Defendant County has shown that no material issues of fact exist to overcome the County's statutory entitlement to design immunity. As is made clear by the Goralka Declaration . . . the [Plans] were approved by Deputy County Engineer David Solomon, a licensed civil engineer and traffic engineer on [March 3, 1995]. He was in charge of the County of San Diego Design [E]ngineering Section. As the person in charge of that Section, he had been delegated by the County Board of Supervisors, through the Director of the Department of Public Works, to have discretion and authority to approve such plans. This bespeaks sufficient discretion to entitle the County to invoke design immunity, as a matter of law. The court finds that the Goralka declaration is of solid evidentiary value and inspires confidence in the conclusions expressed.

12

"Further, . . . (as built) Drawings were signed off on by John Bidwell, a licensed civil engineer who served as Senior Civil Engineer of the County's Design Engineering Section on [April 13, 1998]. [Citation.] Defendant County has satisfied the three elements necessary to show the County's entitlement to design immunity by substantial evidence . . . . Typically, the opinion of a civil engineer as to the reasonableness of the design constitutes the 'substantial evidence' that is necessary to support the design immunity defense. [Citation.]

"The fact that Plaintiffs have an expert, Ed Stevens, who disagrees with the County's witness, is of no consequence. It does not matter whether the evidence of reasonableness is disputed, as the statute provides immunity even when the public entity's substantial evidence of the reasonableness of its design is contradicted by the opposing party's traffic engineer. [Citations.]

"The court finds that there is substantial evidence upon which a reasonable public employee could have adopted the plan or design which gave rise to the 1998 modifications to Cole Grade Road near the subject intersection. . . . Further the court determines that plaintiff has failed to offer material admissible evidence of significant changed physical conditions since 1988 rendering the subject intersection dangerous (let alone that the County had prior notice of same). There is no material triable issue of fact on this contention. The County is entitled to Judgment as a matter of law."[9]

The trial court subsequently entered judgment in favor of the County.

D. *The Hamptons' appeal*

The Hamptons timely appealed from the judgment.

---

[9] The trial court also sustained numerous objections that the County made to Stevens's declaration, including portions of his declaration described above. On appeal, the Hamptons contend that the trial court erred in sustaining those objections, contending that the "propriety of [the County's] objections turns on this court's view of the law on design immunity." We need not consider the propriety of the trial court's evidentiary rulings, because even assuming that *all* of Stevens's declaration was admissible, for the reasons that follow, we conclude that the trial court properly granted the County's motion for summary judgment.

13

### III.

### DISCUSSION

*The trial court properly granted the County's motion for summary judgment*

A.   *The trial court properly determined that the County established, as a matter of law, the affirmative defense of design immunity*

The Hamptons contend that the trial court erred in concluding that the County established, as a matter of law, the affirmative defense of design immunity.

1.   *Governing law*

a.   *The law governing summary judgment*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  A defendant may make this showing by demonstrating that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action.  (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466.)

In reviewing a trial court's ruling on a motion for summary judgment, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.  [Citations.]'  [Citation.]"  (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143.)

> b. *General principles of law governing the affirmative defense of design immunity*

In *Cornette v. Department of Transp.* (2001) 26 Cal.4th 63, 69 (*Cornette*), the

Supreme Court explained the purpose of the design immunity defense as follows:

> "The rationale for design immunity is to prevent a jury from second-
> guessing the decision of a public entity by reviewing the identical
> questions of risk that had previously been considered by the
> government officers who adopted or approved the plan or design.
> [Citation.] ' " '[T]o permit reexamination in tort litigation of
> particular discretionary decisions where reasonable men may differ
> as to how the discretion should be exercised would create too great a
> danger of impolitic interference with the freedom of decision-
> making by those public officials in whom the function of making
> such decisions has been vested.' " [Citation.]' [Citation.]" (*Id.* at
> p. 69.)

Section 830.6, which codifies the defense of design immunity, provides in relevant

part:

> "Neither a public entity nor a public employee is liable under this
> chapter for an injury caused by the plan or design of a construction
> of, or an improvement to, public property where such plan or design
> has been approved in advance of the construction or improvement by
> the legislative body of the public entity or by some other body or
> employee exercising discretionary authority to give such approval or
> where such plan or design is prepared in conformity with standards
> previously so approved, if the trial or appellate court determines that
> there is any substantial evidence upon the basis of which (a) a
> reasonable public employee could have adopted the plan or design or
> the standards therefor or (b) a reasonable legislative body or other
> body or employee could have approved the plan or design or the
> standards therefor."

"In other words, a public entity claiming design immunity must establish three

elements: (1) a causal relationship between the plan or design and the accident; (2)

discretionary approval of the plan or design prior to construction; and (3) substantial

15

evidence supporting the reasonableness of the plan or design. [Citations.]" (*Cornette*, *supra*, 26 Cal.4th at p. 69.)

The discretionary approval element may be resolved as an issue of law if the material facts pertaining to the element are undisputed. (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 940 (*Grenier*).) The element "simply means approval in advance of construction by the legislative body or officer exercising discretionary authority." (*Ramirez v. City of Redondo Beach* (1987) 192 Cal.App.3d 515, 526 (*Ramirez*).) "A detailed plan, drawn up by a competent engineering firm, and approved by a city engineer in the exercise of his or her discretionary authority, is persuasive evidence of the element of prior approval." (*Grenier*, *supra*, at pp. 940-941.)

The third element, substantial evidence supporting the reasonableness of plan or design *always* presents a question of law. (See *Cornette*, *supra*, 26 Cal.4th at p. 72 ["Section 830.6 clearly makes the resolution of the third element of design immunity, the existence of substantial evidence supporting the reasonableness of the adoption of the plan or design, a matter for the court, not the jury."].) Further, the statute provides immunity when there is *any* substantial evidence of reasonableness, even if contradicted. (*Grenier*, *supra*, 57 Cal.App.4th at p. 940.)

2.     *Application*

The Hamptons contend that the trial court erred in concluding that the County established the elements of discretionary approval of the Plans and substantial evidence supporting the reasonableness of the Plans. We consider each element in turn.

16

a. *Discretionary approval*

The County presented undisputed evidence that a licensed civil and traffic engineer working for the County, David Solomon, approved the Plans prior to the construction of the improvements. The Plans consist of construction documents that include various drawings, including details of the intersection at which the accident occurred. The Plans themselves indicate that they have been "approved by" Solomon. The County also presented undisputed evidence both that Solomon had the discretionary authority to approve the Plans, and that a licensed engineer working for the County approved and signed "as built" plans after construction of the improvements. This evidence demonstrates the discretionary approval element, as a matter of law. (See, e.g., *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1263 (*Laabs*) [evidence that an engineer employed by a public entity "reviewed and approved" construction plans established discretionary approval element as a matter of law]; *Grenier*, *supra*, 57 Cal.App.4th at p. 941 [concluding that City established discretionary approval element as a matter of law where "plans were prepared by Saguchi, a civil engineer, and approved by Alvarado, the city engineer, after review"]; *Ramirez*, *supra*, 192 Cal.App.3d at p. 525 [concluding discretionary approval element demonstrated as a matter of law where "the City's engineer, along with the engineers and other officials of the county who were recognized as being competent in the design of highways, approved the design before it was adopted by the City"].)

17

In arguing that the trial court erred in concluding that the County established the discretionary approval element, the Hamptons cite two cases, *Levin v. State of California* (1983) 146 Cal.App.3d 410 (*Levin*), and *Hernandez v. Department of Transp.* (2003) 114 Cal.App.4th 376 (*Hernandez*).  The Hamptons argue, "*Levin* and *Hernandez* teach that where, as here, there is evidence the design at issue violated the public entity's own standards, the public entity cannot establish the second element of design immunity—discretionary approval—unless it shows that the engineer who approved the plans (1) knew it was substandard, (2) elected to disregard the standard, *and* (3) had the authority to do so."  We agree that *Levin* and *Hernandez* support this proposition.  (*Levin*, *supra*, at p. 418 [concluding that state failed to establish discretionary approval of plans because state failed to show that the public employee who approved plans decided to "to ignore the standards [pertaining to placement of a guardrail] or considered the consequences of the elimination of the eight feet shoulder"]; *Hernandez*, *supra*, at p. 388 [concluding triable issue of fact existed as to discretionary approval element because there was "[c]onflicting evidence . . . presented in the trial court as to whether the off-ramp design at issue in this case deviated from the applicable guardrail standards and, if so, whether that deviation was knowingly approved by the responsible Caltrans authorities"].)  However, for reasons we explain below, we do not find either decision persuasive in this regard, and we therefore decline to follow *Levin* or *Hernandez* with respect to the nature of the evidence that the governmental entity must present to establish the discretionary approval element.

18

In *Levin*, Dr. Marcia Levin was killed in an automobile accident that occurred when she tried to avoid a head-on collision with a drunk driver who had illegally crossed the double yellow line, into Levin's lane. (*Levin*, *supra*, 146 Cal.App.3d at p. 414.) Levin was "driving at a lawful speed, and in a reasonable manner, and tried to avoid the collision swerving to her right, but went over a steep embankment into the channel from which the embankment had been excavated." (*Ibid*.) Levin's car overturned and she drowned. (*Id*. at p. 415.) Levin's family members sued the state and brought a cause of action for wrongful death. (*Id*. at p. 413.) The state filed a motion for summary judgment based on the defense of design immunity, which the trial court granted. (*Ibid*.)

On appeal, the Levins contended that the trial court erred in granting the state's motion for summary judgment. (*Levin*, *supra*, 146 Cal.App.3d at pp. 413-414.) After outlining the elements of the design immunity defense, and concluding that the causal relationship element of design immunity had been established (*id.* at pp. 415- 417), the *Levin* court noted that the discretionary approval element was "the major focus of the contentions on this appeal." (*Id.* at p. 417.) With respect to this element, the *Levin* court observed that the changes to Route 37 had been approved by a person named J. A. Legarra, a state deputy highway engineer who had the authority to approve such changes. The *Levin* court also noted that the record contained evidence that another state engineer had "considered the placement of a median barrier and exterior guardrails, but concluded that neither was advisable on this particular stretch of Highway 37." (*Id*. at p. 418.) Despite the existence of this evidence, the *Levin* court concluded that the state had not established the discretionary approval element of its design immunity defense, reasoning:

19

"The state has not challenged the existence and application of the . . . guardrail standards. [The state's evidence does] not mention them or the degree of the steep slope created by the embankment, which was created by the 1974 construction. There was no evidence that Legarra had discretionary authority to disregard the standards.

"As our Supreme Court pointed out in *Cameron v. State of California* (1972) 7 Cal.3d 318, 326 [(*Cameron*)], the rationale of the design immunity defense is to prevent a jury from simply reweighing the same factors considered by the governmental entity which approved the design. *An actual informed exercise of discretion is required*. The defense does not exist to immunize decisions that have not been made. Here, as in *Cameron*, *supra*, the design plan contained no mention of the steep slope of the embankment. The state made no showing that Legarra, who alone had the discretionary authority, decided to ignore the standards or considered the consequences of the elimination of the eight feet shoulder. It follows that the state also failed to establish the second element of the defense." (*Id*. at p. 418, italics added; accord *Hernandez*, *supra*, 114 Cal.App.4th at p. 388 [applying *Levin* and concluding that triable issues of fact existed as to discretionary approval element of design immunity defense in light of conflicting evidence as to whether off-ramp design at issue in case deviated from applicable standards and, if so, whether deviation was *knowingly* approved,] italics added.)

We respectfully disagree with *Levin* and *Hernandez* to the extent they suggest that a public entity attempting to establish the discretionary approval element of a design immunity defense must establish an exercise of *informed* discretion, and that evidence that the public entity failed to adhere to *standards* pertaining to an element of a design plan constitutes evidence of a lack of discretionary approval of the design. The text of section 830.6, from which the discretionary approval element is derived, does not contain any requirement of *informed* discretion. (See *Alvis v. County of Ventura* (2009) 178 Cal.App.4th 536, 552 (*Alvis*) ["[S]ection 830.6 does not state the approval must be knowing or informed. A court may not rewrite a statute to make it conform to a

20

presumed intent that is not expressed."].)  Nor does the relevant statutory text require the presentation of evidence demonstrating that the design conformed to relevant *standards*. On the contrary, the statute provides that the discretionary element may be established *either* by evidence of appropriate discretionary approval *or* evidence that the plan conformed with previously approved standards.  (§ 830.6 ["Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design . . . where such plan or design has been approved . . . by some . . . employee exercising discretionary authority to give such approval *or* where such plan or design is prepared in conformity with standards previously so approved," italics added].)

The Supreme Court's decision in *Cameron*, *supra*, 7 Cal.3d 318, the sole case that the *Levin* court cites in its analysis of the discretionary approval element,[10] does not support a requirement that the design conform to previously approved standards.  In *Cameron*, plaintiffs suffered injuries in an automobile accident that occurred after the driver of the vehicle in which they were traveling lost control of the vehicle while negotiating a curve on a highway.  (*Cameron*, *supra*, at p. 321.)  The plaintiffs brought a cause of action against the state alleging that it "failed in its duty to keep the highway in a safe condition in that the curve was so improperly graded or banked that an automobile could not negotiate the curve even though going at a lawful speed."  (*Id*. at p. 322.)  The trial court concluded that the state established as a matter of law all of the elements of its

---

10      *Levin*, *supra*, 146 Cal.App.3d 410 is the only relevant authority that the *Hernandez* court cited with respect to this issue.  (See *Hernandez*, *supra*, 114 Cal.App.4th at pp. 385-388.)

design immunity defense. (*Id*. at p. 322, fn. 3.) On appeal, the Supreme Court agreed with the plaintiffs "that the design immunity conferred by Government Code section 830.6 is inapplicable since the design plan approved . . . did not specify the degree of superelevation [on the curve] and since it was the improper superelevation which constituted the dangerous condition causing the accident." (*Id*. at p. 322.)

*Cameron* does not support the *Levin* court's interpretation of the discretionary approval element because the holding in *Cameron* was premised not on an analysis of the element of discretionary approval, but on the court's analysis of an entirely different element of the design immunity defense, namely, the requirement that there be a causal relationship between the plan and the accident. In *Cameron*, the court determined that a causal relationship was lacking because the plan did not contain the design feature (a superelevated curve) that plaintiffs alleged was the cause of the accident. (*Cameron*, *supra*, 7 Cal.3d at p. 326 [concluding that because the "superelevation as . . . constructed did not result from the design or plan introduced into evidence[,] . . . there was no basis for concluding that any liability for injuries *caused* by this uneven superelevation was immunized by section 830.6," fn. omitted, italics added].)

In addition, while the *Levin* court was correct in noting that the *Cameron* court observed that the rationale of the design immunity defense is to prevent a jury from simply reweighing the same factors considered by the governmental entity that approved the design (*Levin*, *supra*, 146 Cal.App.at p. 418, citing *Cameron*, *supra*, 7 Cal.3d at p. 326), the *Cameron* court merely stated that this rationale would not be served by providing immunity for a lawsuit based on the existence of a project design that is

22

*unrelated* to the accident.  In contrast, permitting a jury to reweigh the reasonableness of a project design that *is* related to the accident, as in *Levin* and as in this case,[11] *would* permit a jury to simply reweigh the same factors already considered by the governmental entity, in contravention of the rationale for design immunity.

On a related point, the *Levin* court's statement in arguing that a public entity must demonstrate that its employee's approval was *informed (Levin*, *supra*, 146 Cal.App.3d at p. 418), conflates the third element of design immunity—the reasonableness of the design, with the second—discretionary approval of the plans.  This conflation is significant, because while conflicting evidence as to the discretionary approval element would require that a public entity's motion for summary judgment premised on design immunity be denied (*Grenier*, *supra*, 57 Cal.App.4th at p. 940), conflicting evidence as to the reasonableness of the design would not (*ibid*.).

Finally, the determination of the nature of the evidence necessary to satisfy this element in *Levin* and *Hernandez* is in conflict with numerous decisions in which courts have held that the discretionary approval element is satisfied by proof that the plans were

---

11     In *Levin*, as noted above, the court concluded that the causal relationship element of design immunity had been established.  (*Levin*, *supra*, 146 Cal.App.3d at pp. 415-417.) In this case, the Hamptons did not dispute in the trial court or in this court that the County established the existence of a causal relationship between the design and the accident. Thus, we need not consider whether any alleged inadequacy of sight distance at the intersection as built was *unrelated* to the design plans, as was the case with the superelevated curve at issue in *Cameron*.  (See *Cameron*, *supra*, 7 Cal.3d at p. 326.) Further, nothing we say in this opinion is contrary to the *Cameron* court's holding that evidence that a plan *omitted* the condition that is the alleged cause of the accident may defeat a showing of a causal relationship, since that element is not in dispute in this case. (*Ibid*.)

23

approved by a public employee having discretionary authority to effectuate such approval. (See e.g., *Becker v. Johnston* (1967) 67 Cal.2d 163, 172-173 (*Becker*); *Laabs*, *supra*, 163 Cal.App.4th at p. 1263; *Grenier*, *supra*, 57 Cal.App.4th at p. 941; *Ramirez*, *supra*, 192 Cal.App.3d at p. 525.) For example, in *Becker*, *supra*, at pages 172-173, the Supreme Court cited the following evidence pertaining to the discretionary approval element of the design immunity defense at issue in that case:

> "The record in this case contains a copy of the plans of the intersection here involved, as recorded by the Recorder of Sacramento County in State Highway Map Book 3. Such plans on their face indicate that on July 11, 1927, they were approved by F.W. Hazelwood, Division Engineer, Division III; Fred Quinn, Engineer, Surveys and Plans; and R.W. Morton, State Highway Engineer; and, further, that the work was completed in 1929 in accordance with the plans."

The *Becker* court held that this evidence, when considered in connection with evidence pertaining to the reasonableness of the design plan, established, as a matter of law, the public entity's design immunity defense. (*Id*. at p. 173.)

As discussed above, in this case, the evidence that the County presented pertaining to the discretionary approval of the Plans is similar to that presented in *Becker* and in numerous other cases in which courts have concluded that a public entity demonstrated the discretionary approval element as a matter of law. Accordingly, we conclude that the trial court properly determined that in presenting undisputed evidence that a licensed civil and traffic engineer employed by the County approved the Plans prior to construction, that this engineer had the discretionary authority to approve the Plans, and that another licensed engineer employed by the County approved and signed the "as built" plans after

24

construction of the improvements, the County demonstrated the discretionary approval element of its design immunity defense as a matter of law.

b.        *Substantial evidence of the reasonableness of the Plans*

The Hamptons also contend that the trial court erred in concluding that the County presented substantial evidence supporting the reasonableness of the plans.

i.        *Additional relevant law*

As discussed above, a public entity claiming a design immunity defense must present substantial evidence supporting the reasonableness of the plan or design. (*Cornette*, *supra*, 26 Cal.4th at p. 69.)  "In order to be considered substantial, the evidence must be of solid value, which reasonably inspires confidence.  [Citations.]" (*Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 757.)  "The task for the trial court is to apply the deferential substantial evidence standard to determine whether any reasonable [public] official could have approved the challenged design.  [Citation.]  If the record contains the requisite substantial evidence, the immunity applies, even if the plaintiff has presented evidence that the design was defective.  [Citation.]"  (*Ibid*.)  In *Ramirez*, *supra*, 192 Cal.App.3d 515, the court explained the rationale for this standard, as follows:

> "The statute does not require that property be perfectly designed, only that it be given a design which is reasonable under the circumstances.  By deciding on a 'reasonableness' standard, the Legislature intended that government officials be given extensive leeway in their decisions concerning public property.

"A governmental entity. . . is entitled to rely on what is apparently competent advice in making legislative decisions. The fact that on hindsight that advice may prove to have been flawed is not a basis for imposing liability on the governmental entity." (*Id*. at p. 525.)

Therefore, " ' "[A]s long as reasonable minds can differ concerning whether a design should have been approved, then the governmental entity must be granted immunity." [Citation.]' [Citation.]" (*Sutton v. Golden Gate Bridge, Highway & Transportation Dist.* (1998) 68 Cal.App.4th 1149, 1158.)

"The fact of approval by competent professionals can, in and of itself, establish the reasonableness element. (See, e.g., *Ramirez*[, *supra*,] 192 Cal.App.3d at p. 526.)" (*Higgins v. State of California* (1997) 54 Cal.App.4th 177, 187 (*Higgins*).) However, "[t]ypically, 'any substantial evidence' consists of an expert opinion as to the reasonableness of the design, *or* evidence of relevant design standards. [Citations.]" (*Laabs*, *supra*, 163 Cal.App.4th at pp. 1263-1264, italics added.)

ii.     *Application*

It is undisputed that the Plans were approved by a licensed civil and traffic engineer. As this court recognized in *Compton v. City of Santee* (1993) 12 Cal.App.4th 591, this fact supports a finding of reasonableness. (*Id*. at p. 597 ["First, the design of the Magnolia Avenue Bridge was supervised by R. J. Massman, county engineer. This factor, alone, probably suffices to establish immunity."].) In addition, Goralka's declaration in which he stated that "[t]he [Plans] are reasonable," constitutes additional evidence of the reasonableness of the plans. (*Laabs*, *supra*, 163 Cal.App.4th at pp. 1263-1264 [substantial evidence of the reasonableness of a design may be demonstrated by an

26

expert's opinion]; see also *Hefner v. County of Sacramento* (1988) 197 Cal.App.3d 1007, 1015 (*Hefner*) ["Ordinarily, the opinion of a civil engineer as to the reasonableness of a design constitutes 'any' substantial evidence sufficient to support a design immunity defense under section 830.6"].)

Contrary to the Hamptons' contention that Goralka's declaration is "perhaps the charter example of conclusory expert testimony," Goralka provided a reasoned explanation for his conclusion that the operational sight distance at the intersection is adequate. Goralka explained that it was reasonable for the engineer to anticipate that a reasonable driver on westbound Miller Road would move slowly past the limit line on Miller Road in order to gain adequate sight distance to the left, prior to entering the intersection with Cole Grade Road. That Goralka's explanation is reasonable finds support in case law:

> "The practice of stopping at a limit line and then 'creeping' forward to a point of visibility has long been recognized as 'practical' under California law. [Citation.] There are many reasons why a limit line would be placed where visibility of oncoming traffic might be impaired. Troll[e]y or railroad tracks could require the limit line to be set back from the intersection. Or (as anyone who has driven in San Francisco would understand), many times the limit line is placed below the crest of a steep hill to avoid a pedestrian crosswalk, requiring the driver to cross the limit line before he or she can tell whether it is safe to proceed further." (*Hefner*, *supra*, 197 Cal.App.3d at p. 1016.)

The Hamptons' presentation of conflicting expert testimony as to the reasonableness of the Plans does not demonstrate that the County failed to present substantial evidence of their reasonableness. (See, e.g., *Grenier*, *supra*, 57 Cal.App.4th at p. 941 ["That a plaintiff's expert may disagree does not create a triable issue of fact," as

27

to the existence of substantial evidence of the reasonableness of a design]; *Higgins*, *supra*, 54 Cal.App.4th at p. 186 [same]; *Compton*, *supra*, 12 Cal.App.4th at pp. 596-597 [same].)

The Hamptons' citation to *Levin*, *supra*, 146 Cal.App.3d at page 418, also does not support reversal.  While the *Levin* court concluded that the testimony of the state's expert witness in that case did not constitute substantial evidence of the reasonableness of the design plan, the *Levin* court reached this conclusion in part because there was *undisputed* evidence that the design at issue did not meet applicable standards.  (*Ibid*. ["The state has not challenged the existence and application of the above quoted guardrail standards"].)  In contrast, in this case, the County maintains that the intersection complied with all applicable County guidelines for sight distance.  The County supported this argument in the trial court with expert testimony that the intersection provides adequate sight distance, when such distance is probably measured under County standards.  (See pt. II.B.3., *ante*.)  Under these circumstances, the fact that the Hamptons' expert concluded otherwise does not preclude summary judgment.  For example, in *Compton*, *supra*, 12 Cal.App.4th 591, the plaintiff presented an "expert's testimony that the 'sight distances' were below recommended standards," and argued that "this testimony raises an issue of fact as to whether the design was reasonable."  (*Id*. at p. 596.)  This court rejected plaintiff's argument, reasoning:

"The problem with this argument is that it does not focus on the key determination to be made in a design immunity case. The issue is not whether the trial court or jury could find the design unreasonable based on conflicting evidence, but whether there is *any* reasonable basis on which a reasonable public official could initially have approved the design." (*Id.* at pp. 596-597; accord *Grenier*, *supra*, 57 Cal.App.4th at pp. 938, 940-942 [concluding City presented substantial evidence of the reasonableness of a design notwithstanding plaintiff's expert testimony that design failed to meet various applicable standards].)

Further, the *Levin* court's conclusion that the state had failed to present substantial evidence of the reasonableness of the design at issue in that case was premised in part on the fact that "the record reveals a conflict between Levin's experts and the state's as to the reasonableness of the design." (*Levin*, *supra*, 146 Cal.App.3d at p. 418.) However, as noted above, the law is well established that "section 830.6 provides immunity even if the evidence of reasonableness is contradicted." (*Alvis*, *supra*, 178 Cal.App.4th at p. 554.) We therefore decline to follow the reasoning of *Levin* in this respect.

In sum, the trial court properly concluded that there is substantial evidence in the record that the Plans are reasonable.

3.     *Conclusion*

Contrary to the Hamptons' counsel's suggestion at oral argument, we do not hold that a public entity is entitled to design immunity any time an employee with authority signs off on a plan and another employee/engineer attests that the plan is reasonable. To begin with, as noted previously, the Hamptons did not dispute in the trial court or in this court that the County established a causal relationship between the Plans and the accident. Thus, while "section 830.6 does not immunize for liability caused independent

29

of design," we have no occasion to consider the potential application of this principle in this case. (*Alvis*, *supra*, 178 Cal.App.4th at p. 550, citing *Cameron*, *supra*, 7 Cal.3d at pp. 328-329.) With respect to the discretionary approval element, we conclude that the trial court properly determined that the County presented evidence establishing that an employee with discretionary authority approved the Plans for the redesign of the intersection at issue, and that nothing more is required to establish the second element of design immunity. Finally, we conclude that the County presented substantial evidence of the reasonableness of the Plans by offering expert testimony that the intersection provides adequate sight distance when such distance is properly measured under the applicable County guideline. Accordingly, we conclude that the trial court properly determined that the County established, as a matter of law, the affirmative defense of design immunity.

B.      *The trial court properly determined that there is no triable issue of fact with respect to the Hamptons' contention that changed circumstances resulted in a loss of design immunity*

The Hamptons maintain that the trial court erred in concluding that they failed to demonstrate a triable issue of fact with respect to their contention that changed circumstances at the intersection resulted in a loss of design immunity.

1.      *Governing law*

In order to defeat the County's motion for summary judgment on the ground of loss of design immunity, the Hamptons bore the burden of producing evidence sufficient to demonstrate a triable issue of fact with respect to the following three elements: (1) the plan or design has become dangerous because of a change in physical conditions; (2) the public entity had actual or constructive notice of the dangerous condition thus created;

30

and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or the public entity, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably attempted to provide adequate warnings. (*Laabs*, *supra*, 163 Cal.App.4th at p. 1268.)

2. *Application*

The Hamptons contend that they established the existence of a triable issue of fact with respect to whether the County lost any applicable design immunity based on the existence of an "accumulation of additional foliage on the embankment which further limited sight distance looking south from Miller Road." We are not persuaded.

To begin with, we disagree that any changes in the physical topography of the embankment constituted evidence that the design for the intersection had become dangerous. It is undisputed that the embankment does not impede operational sight distance for a westbound driver on Miller Road looking south on Cole Grade Road who is within eight feet of the edge of lane of traffic on Cole Grade Road regardless of any overgrowth.[12] Further, as discussed above, the County presented evidence that it was reasonable for an engineer to design the intersection using operational sight distance

---

[12] The County's retained expert testified that the embankment had no effect on sight distance when a driver is "within 8 feet of the edge line," and stated "the embankment is not a factor, in my opinion." The Hamptons' expert, Edward Stevens, was asked during his deposition, "[I]f Mr. Hampton had pulled forward and just before entering—the front of his vehicle would enter and cross into that through lane, if he had looked left, Mr. Cullen's vehicle would be within his view if it was within 550 feet of the intersection, correct?" Stevens responded, "That's true."

31

calculations measured from this location. (See pt. II.B.3., *ante*.) Thus, any changes in the physical condition of the embankment do not constitute evidence of a dangerous condition.

With respect to the notice element, the Hamptons cite a 2008 "County of San Diego - Department of Public Works Traffic Engineer Request." This one-page handwritten document appears to pertain to a citizen's request that an "Adopt-A-Road" sign be placed on Miller Road. The document recommends removing Miller Road from the Adopt-A-Road availability list on the grounds that the "majority of the road is curvilinear," and there are "limited roadsides[13] due to vegetation being overgrown and [the] embankment." The document does not refer to the intersection in question, and clearly does not demonstrate the existence of a triable issue of fact with respect to whether the County had actual or constructive notice of a dangerous condition created by the purported changed condition. Finally, the Hamptons do not discuss the third element of loss of design immunity, pertaining to funding, in their brief.

Accordingly, we conclude that the Hamptons failed to demonstrate that the trial court erred in determining that there is no triable issue of fact with respect to the Hamptons' contention that changed circumstances resulted in a loss of design immunity.

---

13    The handwriting on the document makes this word difficult to read, but it appears to state "roadsides."

IV.

DISPOSITION

The judgment is affirmed.  The Hamptons are to bear costs on appeal.


                                                                    AARON, J.


WE CONCUR:


NARES, Acting P. J.


O'ROURKE, J.