[No. B012763. Second Dist., Div. Two. June 8, 1987.]

GUILLERMINA RAMIREZ, Plaintiff and Respondent, v. CITY OF REDONDO BEACH, Defendant and Appellant.

**COUNSEL**

Sidley & Austin, Richard Schauer, Dennis A Ragen and Thomas F. Overlander for Defendant and Appellant.

Michael J. Piuze for Plaintiff and Respondent.

## Opinion

**COMPTON, J.**—Plaintiff Guillermina Ramirez instituted this action against defendant City of Redondo Beach (City) to recover damages for personal injuries she sustained in an automobile collision allegedly caused by a dangerous condition of a public roadway. Following a pretrial hearing, the trial court denied the City's motion for design immunity pursuant to Government Code section 830.6[1] and ruled against it on several vital evidentiary issues. The jury subsequently returned a special verdict assessing plaintiff's damages at $4.5 million and apportioning 80 percent of the fault for the accident to City. The court thereafter entered judgment in the sum of $3.6 million. Defendant's motions for judgment notwithstanding the verdict and new trial were denied, and this appeal followed.

In an opinion filed September 22, 1986, we reversed the judgment after finding, inter alia, that the City was statutorily immune from liability (§ 830.6). We therefore remanded the case to the trial court with directions to enter judgment for the City.

Pursuant to plaintiff's petition for review, the Supreme Court granted a hearing. By an enigmatic order dated January 27, 1987, however, the matter was retransferred to this court with instructions to address the *City's contention, raised in its opening brief,* that it is "entitled to a new trial based on the jury's unusual apportionment of comparative fault."

In our previous opinion, we did not discuss the issue of the "unusual apportionment of comparative fault" since that issue was rendered moot by our disposition of the matter.

As will be apparent from the facts, as discussed *infra,* the evidence is simply insufficient to support a finding that defendant was 80 percent responsible for the injury and thus defendant would, at a minimum, be entitled to a complete retrial of the issue of liability.

Having reconsidered the matter, however, we have again concluded that a retrial is not warranted because the City is entitled to the benefit of the immunity established by section 830.6.

The facts are as follows. Sometime during the evening of June 4, 1976, plaintiff, her father, younger brother, and sister, proceeded from their home to a nearly shopping mall located in the City of Redondo Beach. Arriving at

---

[1] Hereinafter, unless otheriwise indicated, all section references are to the Government Code.

their destination, plaintiff, nearly 16 years old, practiced driving in a virtually empty mall parking lot. After completing the session, the family stopped briefly at a doughnut shop in the vicinity of the lot and made several purchases. Leaving the shop, plaintiff once again took control of the car, a 1962 Plymouth Valiant, with her father in the right front seat, and the remainder of the family in the rear. She had driven only once before on a public street, and never at night.[2]

Plaintiff proceeded south from the parking lot to exit onto Manhattan Beach Boulevard. That street's eastbound and westbound lanes[3] were separated by a concrete divider or "median" which ran parallel to the parking lot and ended in a semicircular or club-shaped break.[4] This break did not correspond precisely with the edge of the mall driveway from which plaintiff's car was emerging, but extended nine feet further west. Past the break in the median, which permitted vehicles to turn left into and out of the shopping center, the divider continued in a westerly direction. Approximately 240 feet west of the driveway, planter boxes containing various shrubs, ranging in height from 36 to 42 inches, stood on the median strip.

As plaintiff exited the mall parking lot, she planned to traverse the westbound lanes, negotiate a left turn around the median break, and then enter the eastbound left turn lane on Manhattan so she could proceed north on Inglewood Avenue. Approaching the end of the driveway, plaintiff observed no cross-traffic. She crossed the westbound lanes successfully, then passed around the club-shaped median break without stopping or looking to the right for oncoming vehicles. As she made her left turn around the median break, she apparently failed to notice another car within 30 feet of her on her right, traveling east at approximately 20 to 25 miles per hour in the number one lane and driven by one Richard Bernard. Plaintiff passed directly in front of Bernard's Monte Carlo, entered the number two lane, and then began maneuvering her vehicle into the number one lane. Oblivious to the presence of the other car, plaintiff continued her turning movement.

---

[2] Although plaintiff, having lived in the vicinity of the shopping mall for several years, was familiar with the general configuration of the streets in the area, her driving experience was extremely limited. Prior to the night of the accident, she had practiced driving on nine separate occasions. Although not admitted into evidence at trial, plaintiff possessed neither a learner's permit nor a driver's license.

[3] The eastbound portion of Manhattan contains three through lanes in addition to left and right turn lanes. The left turn lane permitted eastbound traffic on Manhattan to turn north onto Inglewood Avenue. At trial, the eastbound lane nearest the center divider was referred to as the "number one" lane and the middle lane was designated as the "number two" lane.

[4] The westerly end of the divider began at Inglewood Avenue and continued westward past the intersection of Manhattan and McBain Avenue.

Within seconds, the right side of Bernard's vehicle struck the left side of plaintiff's Valiant near the rear wheel.[5]

Immediately following the collision, both cars veered north, proceeding over the median side by side. Plaintiff attempted to apply her emergency brake but her foot slipped and became lodged between the fire wall and the brake. With her foot fractured, she began to lose control of the car. After crossing the divider, Bernard's vehicle came to a stop in the westbound lanes. The Valiant, however, continued to move forward and plaintiff's father—who police later determined had consumed an unknown quantity of alcohol prior to the accident, but was not legally intoxicated—took command of the car. Inside the vehicle, plaintiff's brother heard a "thumping" noise and believed that the steering mechanism had been damaged. Police officers witnessing the event noticed that the left front wheel of the Valiant had been damaged, causing the car to tilt and wobble.[6] Other witnesses observed the vehicle accelerate in an easterly direction while still in the westbound lanes of Manhattan Beach Boulevard, then cross back over the median into the eastbound lane. One of the officers observing the path of the automobile yelled "Hit and Run" and proceeded to follow the car on foot.

At a speed of 25 to 35 miles per hour, plaintiff's vehicle collided with a light standard at a service station located on the southeast corner of Manhattan and Inglewood Avenue, more than 300 feet east of the car's first impact with Bernard's Monte Carlo. The very force of the crash caused a portion of the vehicle to rise approximately six feet in the air before descending to the hard pavement below.[7]

Although plaintiff was in shock and approaching hysteria following the accident, plaintiff's father laid her body across the front seat and instructed

---

[5] At trial, Bernard testified that at all times his view of plaintiff's vehicle was unobstructed. Other witnesses stated that traffic on Manhattan Beach Boulevard was virtually nonexistent at the time of the accident and that lighting conditions were good to excellent.

Bernard further testified that, contrary to earlier reports he had provided to his insurance agent and other investigating officers, the Valiant never exited from the parking lot driveway on the north side of Manhattan but from an alley on the southside of the street, directly across from and parallel to the shopping mall. According to his version of events, plaintiff's vehicle did not traverse the break in the median or cross the number one eastbound lane. Instead, the Valiant proceeded from the alleyway across several eastbound lanes on Manhattan and then, upon attempting to enter the number one lane, collided with his Monte Carlo. One police officer, who witnessed the event from a position adjacent to the doughnut shop, testified that although he did not see any vehicles exit the parking lot, he did see lights in the alleyway sometime before the initial collision. Nevertheless, he could not identify the lights he observed as those emanating from plaintiff's vehicle.

[6] Two uniformed police officers were standing near the doughnut shop immediately before the accident, one of whom was positioned in close proximity to the parking lot driveway.

[7] The collision with the lightpole was, by most estimates, the most severe of the evening; plaintiff was traveling two to four times faster than at the moment of impact with Bernard's vehicle.

her to tell the police and others that he had been driving the car. Somewhat afraid of her father and suffering excruciating pain from her numerous injuries, plaintiff acceded to the request.[8]

As a result of the collisions, plaintiff suffered, and continues to suffer, a panoply of problems and complications arising from C-6 quadriplegia, including no feeling below her chest, decreased respiratory function, and functional loss of upper limb mobility.

It seems at once apparent that the triggering event in this accident was the plaintiff's attempting to change lanes after the turn, which attempt led to the collision with the Bernard vehicle, and that plaintiff's severe injuries resulted from the collision with the light standard after the father had taken over control of the car.

Plaintiff commenced this action against the City contending essentially that the design of the median strip, which forced her to turn wide into the number two lane, was the cause of the accident.

Although plaintiff suggests that the shrubbery on the westerly portion of the median strip was a contributing factor to the dangerous condition she alleged existed, it appears that it in fact played no role in this particular accident. Plaintiff had passed through the median strip without incident and was in a position of safety at the time she commenced to move into the number one lane.

Even plaintiff's experts opined that the shrubbery in and of itself was not the cause of the accident but was only a factor when considered in conjunction with the design of the easterly portion of the median. Thus, plaintiff's case must stand or fall on establishing that the City was liable for the physical design of that portion of the median which allegedly forced the wide turn.

Testifying that the shape and placement of the median's semicircular nose constituted a patently hazardous condition, plaintiff's experts asserted that an automobile, positioned in the driveway south of Winchell's, could not negotiate a normal turn at normal speeds in order to proceed eastbound

[8] Subsequently, plaintiff filed a complaint against her father alleging that he was the driver of the Valiant. His insurance company eventually settled the matter for $30,000. Plaintiff's initial complaint against the City also averred that she was merely a passenger in the vehicle. The complaint was later amended to allege that she was an "occupant." Sometime after the accident plaintiff also signed a document under penalty of perjury declaring that she was a passenger on the night of the collision. At trial, of course, plaintiff testified that she was the driver of the Valiant, not her father.

on Manhattan Beach Boulevard without encroaching into the number two lane. A driver proceeding left out of the driveway, and intending to make a second left turn on to Inglewood Avenue, purportedly faced various unforeseen problems. Instead of crossing three lanes, as would be expected if the median did not induce wide-turning maneuvers, the vehicle would pass five different lanes in a very short distance. According to the experts, each change of lanes represented a potential conflict point that would not be anticipated by the average driver. As for an automobile moving east on Manhattan and approaching the break in the divider, its driver allegedly would not anticipate that the turning vehicle, positioned in the number two eastbound lane, would continue in a semicircular course as it followed the contours of the median nose.

Essentially, plaintiff's action against the City is grounded on section 835, subdivision (b), which provides that a public entity is liable for injury proximately caused by a dangerous condition of its property if the dangerous condition created a reasonably foreseeable risk of the kind of injury sustained and the public entity had actual or constructive notice of the condition a sufficient time before the injury to have taken preventive measures.[9]

■ At this juncture, we think it is important to note that the purpose of the Tort Claims Act was to restore to public entities in California tort immunity after our Supreme Court in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 97, 359 P.2d 465], and *Lipman* v. *Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224 [11 Cal.Rptr. 97, 359 P.2d 465] abolished the doctrine. Immediately following the court's decisions, the Law Revision Commission, working at the behest of the Legislature, spent nearly two years analyzing the problem, making recommendations and formulating a new statutory scheme. (4 Cal. Law Revision Com. Rep. (1963) pp. 803, 804 and 807.) The commission recommended the Legislature adopt the concept that a public entity is immune except in stated circumstances (§ 815) other than the converse, i.e., a public entity is liable unless the statute sets forth an exception. Section 835 was adopted virtually verbatim by the Legislature in the form recommended by the commission.

At the heart of this case is section 830.6 which provides in relevant part: "Neither a public entity nor a public employee is liable under this chapter

---

[9] Section 835 provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that . . . [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the *trial or appellate court* determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor ...." (Italics added.)

■ Thus, regardless of the evidence plaintiff presented as to the defect in the design of the median, she may be denied recovery from defendant if it is established that the City is entitled to statutory immunity under section 830.6.

■ Design immunity is, of course, an affirmative defense to liability for the dangerous condition of public property and as such it must be pleaded and proved by the defendant public entity. (*Cameron v. State of California* (1972) 7 Cal.3d 318, 325 [102 Cal.Rptr. 305, 497 P.2d 777].) Three basic elements must be established in order to claim the defense: first, a causal relationship between the plan and the accident; second, discretionary approval of the plan prior to construction; third, substantial evidence supporting the reasonableness of the design. (*Anderson v. City of Thousand Oaks* (1976) 65 Cal.App.3d 82, 88-89 [139 Cal.Rptr. 127]; *De La Rosa v. City of San Bernardino* (1971) 16 Cal.App.3d 739, 748 [94 Cal.Rptr. 175].)

Here, the applicability of the immunity was considered pretrial in a hearing conducted for that purpose.

The City proffered evidence that sometime in the early 1960's Los Angeles County (county) was engaged by defendant to widen a portion of Manhattan Beach Boulevard from Inglewood Avenue to approximately 300 feet west of the intersection. Design plans were drafted and approved by an engineer for the county's highway division, a member of the county's road department's design section, and by the county's road commissioner. The plan was further approved by the city engineer for defendant, F. C. Nibe and by Nibe's supervisor, Robert L. Smith, director of public works for defendant. Smith testified that in his opinion the county had an excellent reputation for designing streets and that he had no reason to doubt Nibe's engineering competency. Smith also testified that he had personally designed highways in his career.

In rebuttal, plaintiff called as her expert witness Allen Weber, a traffic engineer with an extensive background in road design. He testified that in his opinion the median break represented a "hazardous" condition to a driver exiting by way of the center of the driveway.

Following extensive argument, the court ruled that defendant had failed to meet its burden to show that a reasonable public employee could have adopted the design. The court stated: "I think it is patent, based upon a normal turning radius and the configuration of the median relative to the [driveway] that under normal circumstances and at a reasonable rate of speed that an American car, a standard car, would not be able to negotiate a left-hand turn into the no. 1 lane. That it would be necessary to stray into the no. 2 lane . . . ."

The court then addressed the City's contention that the turn through the median could be safely made if plaintiff had exited from the right-hand side of the two-lane driveway: "It's apparent that a designer cannot reasonably expect someone would take so extraordinary a measure to be so far over to the extreme right that they would apparently be jumping the curb on that side. . . . What we are talking about here is a reasonably expectable and normal exit by a driver. So, one, the physical evidence that is presented to me makes it apparent, and I think patent the turn could not be safely negotiated, could not be done without traversing into at least no. 2 lane."

Lastly, the court stated: "[T]he substantial evidence presented here, essentially, is that this highway was—this part of it was designed by the County of Los Angeles for the city, that the city people had confidence in the county, and that in general the county is competent. And that's it. There is no evidence specifically of any independent exercise of judgment by Mr. Nibe. I would like to assume that Mr. Nibe reviewed this. And I think it's also safe to assume and a proper thing to assume that the city reposed its trust and confidence in Mr. Nibe in giving its discretion to exercise a considered judgment. . . . I don't believe it's a sufficient answer for the city to say that our city engineer, qualified and vested with discretionary authority, simply approved something that someone else did with respect to a defect of this kind. For that reason my conclusion is that 830.6 is not available to the city as a defense in this case."

In examining the sufficiency of the City's proof as to the elements of prior approval and reasonableness of approval of the Manhattan Beach Boulevard plan, we must bear in mind the rationale underlying the theory of design immunity. ■ "Basically, this defense is predicated upon the concept of separation of powers—that is, the judicial branch through court or jury should not review the discretionary decisions of legislative or execu-

tive bodies, to avoid the danger of 'impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested.' [Citations.] Additionally, judicial economy underlies design immunity—forbidding a jury from reweighing the same factors considered by the governmental entity which approve the design. [Fn. omitted; citation.]" (*Anderson* v. *City of Thousand Oaks, supra,* 65 Cal.App.3d 82, 89.)

██ Here the trial court, in effect, reweighed the same factors considered by the governmental entity and concluded that the entity's judgment was flawed.

In this context, we read section 830.6 to mean that as long as reasonable minds can differ concerning whether a design should have been approved, then the governmental entity must be granted immunity. The statute does not require that property be perfectly designed, only that it be given a design which is reasonable under the circumstances. By deciding on a "reasonableness" standard, the Legislature intended that government officials be given extensive leeway in their decisions concerning public property.

A governmental entity, such as the City, is entitled to rely on what is apparently competent advice in making legislative decisions. The fact that on hindsight that advice may prove to have been flawed is not a basis for imposing liabilty on the governmental entity.

In this case, the City's engineer, along with the engineers and other officials of the county who were recognized as being competent in the design of highways, approved the design before it was adopted by the City. Further, an expert witness, produced by the City at the trial of this case, testified that in his opinion the design of the median break was not dangerous, but in fact fostered safety by encouraging vehicles to exit the driveway at reasonable speeds and discouraging them from "rushing out" into busy traffic.

That a paid expert witness for plaintiff, in hindsight, found that the design was defective, does not mean, ipso facto, that the design was unreasonably approved.

As demonstrated in the instant case, competent experts disagreed among themselves. Although plaintiff produced two experts who testified that the condition of the property created a hazardous condition, it should not be concluded that her evidence is more sufficient than that produced by defendant. A mere conflict in the testimony of expert witnesses provides no justification for the matter to go to a lay jury who will then second-guess the

judgment of skilled public officials. (Cf. *Muffett* v. *Royster* (1983) 147 Cal.App.3d 289, 306-307 [195 Cal.Rptr. 73].)

In determining whether the City was entitled to the immunity, it was the trial court's duty under the statute to search for any substantial evidence upon the basis of which "a reasonable public employee could have adopted the plan or design or the standards therefor or a reasonable legislative body or other body or employee could have approved the plan or the design or the standards therefor. . . ."

This it did not do. Instead, as noted, it simply weighed the evidence as to the dangerous nature of the design and found in favor of the plaintiff.

The trial court's attempt to base its decision on a lack of discretionary approval, one of the elements of design immunity, is unpersuasive and indicates a misunderstanding of that requirement.

■ Discretionary approval simply means approval in advance of construction by the legislative body or officer exercising discretionary authority. (*De La Rosa* v. *City of San Bernardino, supra,* 16 Cal.App.3d 739.)

"[A] detailed plan, drawn up by a competent engineering firm, and approved by the city council in the exercise of its discretionary authority, is certainly persuasive evidence of both elements of *prior approval and reasonableness* for purposes of the design immunity defense." (*Anderson* v. *City of Thousand Oaks, supra,* 65 Cal.App.3d 82, 89-90; italics added; fn. omitted.)

■ The issue then is what is the scope of our review of the trial court's decision. Clearly, section 830.6 directs that our review is not whether substantial evidence supports the *trial court's decision* but whether there is any substantial evidence to support a finding that the decision by the City's legislative body was reasonable.

In determining whether evidence is substantial, the question is whether the facts adduced "reasonably [inspire] confidence" and are of "solid value." (*Davis* v. *Cordova Recreation & Park Dist.* (1972) 24 Cal.App.3d 789, 798 [101 Cal.Rptr. 358].) ■ Although the evidence presented to the court was conflicting, there was substantial evidence supporting the view that the design of the median was reasonable. As previously noted, the City's expert witness *did* find that the plan for the median strip was *not* dangerous.

Thus, the City carried its burden in invoking the immunity afforded by section 830.6 and it was error for the trial court to reject it.

Plaintiff's contention that changed conditions deprived the City of design immunity completely ignores the long-settled principle that the "changed condition" exception is applicable only when "experience has revealed the dangerous nature of the public improvement under changed physical conditions" (*Baldwin v. State of California* (1972) 6 Cal.3d 424, 435 [99 Cal.Rptr. 145]) and that "in its actual operation under changed physical conditions [the design produced] a dangerous condition of public property and [caused] injury ...." (*Id.,* at p. 438.)

The record is totally devoid of any evidence tending to establish that experience provided defendant with any indication that the roadway had, because of changed conditions, become dangerous. Plaintiff offered no evidence of any accidents having occurred at the location or that any danger in connection with the median had subsequently come to the attention of the defendant.

The cause of this tragic occurrence must be laid solely upon an inattentive and inexperienced plaintiff and a series of events, involving the actions or inactions of Bernard and plaintiff's father, which defy logical explanation. Permitting this judgment to stand would be tantamount to imposing strict liability on defendant as an insurer of the safety of its streets and allowing a lay jury to second-guess the legislative determination of the City regarding the design of the roadway in question. This we refuse to do.

The judgment is reversed with directions for the trial court to enter a new and different judgment in favor of defendant. Each party to bear their own costs on appeal.

Roth, P. J., and Gates, J., concurred.

A petition for a rehearing was denied July 2, 1987, and respondent's petition for review by the Supreme Court was denied September 23, 1987.