Filed 8/24/15  Jaime v. State of California, DOT CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| FRANCISCO  JAIME, et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>STATE OF CALIFORNIA,<br>DEPARTMENT OF TRANSPORTATION<br><br>    Defendant and Respondent. | 2d Civil No. B256108<br>(Super. Ct. Nos. 1375334, 1378252)<br>(Santa Barbara County) |

Francisco Jaime (Jaime) and Norma Viveros, appellants, are the parents of Jennifer Jaime (Jennifer).  Jennifer was killed after a collision between the car in which she was a passenger and a wrong-way driver.  Appellants filed wrongful death actions against respondent State of California, Department of Transportation.  They purport to appeal from the trial court's order granting respondent's pretrial "motion for judgment on the special defense of design immunity."  We consider the motion to be the functional equivalent of a motion for summary judgment.  The order granting the motion is nonappealable.  However, we construe the order as incorporating an appealable judgment.  We affirm.

*Factual and Procedural Background*

In April 2010 at approximately 3:40 a.m., Jaime was driving his 1992 Mercedes northbound in the number one lane on U.S. Route 101.  His vehicle was north of Clark Avenue in Santa Barbara County.  At this location, northbound U.S. Route 101 consisted of

two 12-foot lanes.  They were separated from the two southbound lanes by a 76-foot wide unimproved median.

Jennifer, who was 10 years old, was in the front passenger seat.  Jaime told the police that "Jennifer was sleeping in the passenger seat with the seat reclined" and was wearing a seat belt.  But an officer who investigated the accident concluded that she was not wearing a seat belt because "[t]he right front seat belt [of the Mercedes] was fully retracted and showed no signs of loading."

Jaime saw "headlights coming directly at him at a high rate of speed."  The headlights were from a 1995 Honda Accord that was going southbound in the northbound number one lane.  The wrong-way driver was Antonio Betancourt.

The left side of the Honda struck the left front of the Mercedes.  The Traffic Collision Report states: "Following this impact, [the Mercedes] . . . left the roadway and entered the dirt/shrub median.  It slid sideways and rotated in a counterclockwise motion. [The Mercedes] continued across the median where the right side tires dug into the soft dirt causing it to overturn . . . ."  The Mercedes landed on its roof in the southbound number two lane and right shoulder.  Jennifer was ejected from the vehicle into the middle of the southbound lanes.  A passenger vehicle traveling southbound drove over her without stopping.

Jaime and Jennifer's mother, Norma Viveros, filed separate wrongful death actions that were consolidated.  Each of appellants' complaints consisted of two causes of action: dangerous condition of public property against respondent (Gov. Code, § 835) and negligence against Betancourt.  The causes of action against respondent alleged that the roadway was in a dangerous condition because there was no barrier between the northbound and southbound lanes "to prevent vehicles from crossing from one side of the roadway to the other."  Jaime claimed that respondent's failure "to install a center divider, wall and/or guardrail created a reasonably foreseeable risk that drivers of vehicles would and could lose control of their vehicles which would result in their vehicles leaving the path of travel on the roadway lanes, go into the center median and beyond and overturn thereby resulting in potentially catastrophic injuries, including death."

On February 25, 2014, respondent filed a pretrial "motion for judgment on the special defense of design immunity" (motion for judgment). Respondent contended that it was immune from liability because the absence of a median barrier was part of the design or plan for the roadway. At an evidentiary hearing on the motion, each side called one expert witness and exhibits were admitted into evidence. In granting the motion, the trial court found that "all three elements [of design immunity] are satisfied and no changed circumstances [exist.]"

*Appellants Impliedly Agreed to the*

*Evidentiary Hearing on the Motion for Judgment*

At oral argument before this court, appellants' counsel asserted: "We did not agree to it [the evidentiary hearing on the motion for judgment], we did not want it, we did not concede to it." "We opposed it in writing and we filed an opposition to it." The written opposition is not included in the record on appeal. Counsel said that the register of actions shows that it was filed on April 11, 2013.

In their briefs, appellants do not contend that in the trial court they opposed conducting an evidentiary hearing on respondent's motion for judgment. Appellants have therefore forfeited this issue. "New issues cannot generally be raised for the first time in oral argument. [Citation.]" (*New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co.* (1992) 7 Cal.App.4th 1088, 1098.) In any event, appellants impliedly agreed to the evidentiary hearing.

Pursuant to Evidence Code sections 452, subdivision (d), and 459, we take judicial notice of the superior court file. On March 22, 2013, almost one year before respondent filed its motion for judgment in February 2014, respondent filed a motion requesting that the special defense of design immunity be bifurcated and tried first pursuant to Code of Civil Procedure section 597.[1] The statute authorizes a separate "trial" on a "defense not involving the merits of the plaintiff's cause of action but constituting a bar or ground of abatement to the prosecution thereof." (*Ibid*.) The opposition filed by appellants on April 11, 2013, was in opposition to respondents' motion for bifurcation. Appellants asserted, "[B]ifurcation

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

pursuant to CCP § 597 is inappropriate as [respondent's] affirmative defense of design immunity involves the merits of [appellants'] cause of action."

On August 8, 2013, a hearing was conducted on respondent's motion for bifurcation. At the conclusion of the hearing, the trial court stated: ". . . I guess I'm not asking you for your agreement necessarily on this. And if there is some objection that occurs to you later that should be made to the process that you can't work out with counsel, you're at liberty to bring that back. [¶] But this is the process I envision at this point; a settlement discussion which would include this issue [design immunity] as well as if there is no resolution of the issue by then, an understanding of how the trial would go forward, but a presentation of the evidence necessary to show that design immunity defense can be presented, and determining what issue of that will or will not need to go to the jury."

On September 13, 2013, the trial court signed an order entitled, "Order re Defendant's Motion for Trial on Special Defenses." The order was prepared by appellants. The court impliedly denied respondent's request that the special defense of design immunity be bifurcated and tried first pursuant to section 597. The court ordered that, if the case is not settled, it "will hold an evidentiary hearing [not a trial] on the issue of Design Immunity and Loss of Design Immunity." "Based on [the] evidence, the Court will decide, as a matter of law, whether [respondent] has proved the third element of Design Immunity (substantial evidence supporting the reasonableness of the plan or design). [¶] For each matter of fact present in the defenses of Design Immunity and Loss of Design immunity, the Court will decide whether that element can be determined as a matter of law, or whether it must remain as a question of fact for the jury to decide."

On February 21, 2014, four days *before* respondent filed its motion for judgment, appellants filed a document entitled, "Plaintiffs' Trial Brief re Design Immunity." In the brief's introduction, appellants stated: "Upon motion of [respondent], on February 26, 2014, this Court will hear evidence regarding [respondent's] affirmative defense that it is entitled to design immunity. For the reasons discussed below, [respondent] is not entitled to design immunity or, in the alternative, there are triable issues of material fact and the jury should determine if [respondent] is entitled to design immunity and, if yes, whether such immunity

4

has been lost due to changed conditions." The trial brief expresses no opposition to conducting the evidentiary hearing.

At the hearing on the motion for judgment, appellants did not object to going forward with the motion. Instead, their counsel asked the court to rule as a matter of law that respondent was not entitled to the affirmative defense of design immunity: "[W]e think after the court hears the testimony, solely limited to the issue of design immunity . . . , the court will find as a matter of law that they're not entitled to it because they can't meet their burden, and rule as a matter of law that they're not entitled to design immunity." Accordingly, we conclude that appellants impliedly agreed to the evidentiary hearing on the motion for judgment.

*Respondent's Motion for Judgment Is the Functional*
*Equivalent of a Motion for Summary Judgment*

"The usual methods for raising a design immunity defense are motion for summary judgment [citation]; motion for nonsuit [citation]; motion for directed verdict [citation]; or a combination of these motions [citation]." (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 573.) At oral argument in this court, counsel for both parties agreed that respondent's pretrial motion for judgment was not a motion for summary judgment. Respondent did not file the required "separate statement setting forth plainly and concisely all material facts which [it] contends are undisputed." (§ 437c, subd. (b)(1).)[2] Furthermore, the summary judgment procedure "do[es] not contemplate live testimony." (*Hobbs v. Weiss* (1999) 73 Cal.App.4th 76, 81, fn. 2.)

But the motion for judgment was the functional equivalent of a motion for summary judgment. The apparent purpose of the motion for judgment was to implement the trial court's prior ruling that it would conduct an evidentiary hearing on the issue of design

---

[2] The omission of the required separate statement of undisputed material facts is not necessarily fatal to a motion for summary judgment. The summary judgment statute provides: "The failure to comply with this requirement of a separate statement *may in the court's discretion* constitute a sufficient ground for denial of the motion." (§ 437c, subd. (b)(1), italics added.)

5

immunity. The court said that at the hearing it would determine whether there were questions of fact for the jury to decide. If no questions of fact existed, the court would decide the design immunity issue as a matter of law. This is similar to the summary judgment procedure. "The court must 'grant[ ]' the 'motion' [for summary judgment] 'if all the papers submitted show' that 'there is no triable issue as to any material fact' [citation] - that is, there is no issue requiring a trial as to any fact that is necessary under the pleadings and, ultimately, the law [citations] - and that the 'moving party is entitled to a judgment as a matter of law' [citation]." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843; see also *Northrop Corp. v. Stinson Sales Corp*. (1984) 151 Cal.App.3d 653, 657 ["a motion for summary judgment . . . cannot decide questions of fact"].)

Counsels' written and oral statements in the trial court indicate that they understood the motion for judgment to be the functional equivalent of a motion for summary judgment. In the motion for judgment respondent's counsel asserted: "Summary judgment is . . . proper." "For purposes of summary judgment, a defendant can rely on the allegations set forth in Plaintiff's pleadings." At the hearing on the motion before the witnesses testified, appellants' counsel stated, "[A]t a very minimum, there are triable issues of material fact and the issues should be resolved by the jury." Counsel was using summary judgment language. After the witnesses had testified, appellants' counsel argued: "This is, of course, a design immunity hearing - it is not the trial - and this is akin to a summary judgment motion. If there are triable issues that could be decided either way, then it should go to the jury. [¶] And it is [respondent's] burden . . . to show that there are no triable issues."

*Pianka v. State* (1956) 46 Cal.2d 208, supports our conclusion that the motion for judgment is the functional equivalent of a motion for summary judgment. In *Pianka* the defendant "raised the defense of sovereign immunity by means of a motion to dismiss supported by an affidavit. The court granted the motion, and plaintiff . . . appealed from the judgment of dismissal." (*Id*., at pp. 209-210.) The motion was not statutorily authorized. Our Supreme Court referred to the motion as a "nonstatutory speaking motion[]" that has "been superseded by the procedure governing motions for summary judgment contained in section 437c of the Code of Civil Procedure. . . ." (*Id*., at p. 211, fn. omitted.) A speaking

6

motion is "a motion supported by facts outside the pleadings." (*Lerner v. Ehrlich* (1963) 222 Cal.App.2d 168, 171.)  The Supreme Court concluded, "[A] speaking motion to dismiss should be treated as a motion for summary judgment in order to preserve the safeguards provided by the statute." (*Pianka v. State*, *supra*, 46 Cal.2d at p. 211.)  The same reasoning applies to respondent's nonstatutory motion for judgment, which in effect is a speaking motion, i.e., a motion supported by facts outside the pleadings.  (See *Lerner v. Ehrlich*, *supra*, 222 Cal.App.2d at p. 172 ["In light of the Supreme Court's directions in the *Pianka* case it seems clear that here the trial court was required to consider respondent Ehrlich's motion to strike [a cross-complaint] as a motion for summary judgment and to decide it upon the basis of the statutory requirements established by Code of Civil Procedure section 437c"]; *Rangel v. Interinsurance Exch.* (1992) 4 Cal.4th 1, 19, fn. 1 ["When a trial court considers matters outside the pleadings in ruling on a motion for judgment on the pleadings, resulting judgments are reviewed as judgments arising from motions for summary judgment"].)

*Appellants Purport to Appeal from a Nonappealable Order*

In their opening brief, appellants state: "This is an appeal from a final judgment pursuant to CCP 904.1(a)(1)."  In their notice of appeal, appellants assert that they are appealing from the order of March 20, 2014, "granting [respondent's] motion for judgment on the special defense of design immunity; and from the judgment entered on March 13, 2014."  The record does not include a judgment, and the register of actions does not show that a judgment was entered.  On March 25, 2014, respondent gave written notice to appellants of a "judgment, decree, or order" that was allegedly entered on March 13, 2014.  The notice states that "[a] copy of the judgment, decree, or order is attached to this notice."  The only attachment is the trial court's order granting respondent's motion for judgment.  The order was signed on March 20, 2014, and entered the following day.

Thus, there is no judgment.  Appellants purport to appeal from the order granting the motion for judgment, which is a nonappealable order.  "[A] summary judgment is appealable, but an order granting summary judgment is not.  [Citations.]  While the court entered an order granting summary judgment, it never entered a summary judgment.  Thus,

7

there was no appealable judgment or order." (*Saben, Earlix & Associates v. Fillet* (2005) 134 Cal.App.4th 1024, 1030.) "[A] reviewing court is 'without jurisdiction to consider an appeal from a nonappealable order, and has the duty to dismiss such an appeal upon its own motion. [Citations.]' [Citation.]" (*In re Mario C.* (2004) 124 Cal.App.4th 1303, 1307.)

Respondent did not raise the appealability issue in its brief. At oral argument respondent's counsel conceded that there is an appealable judgment. "[W]e . . . question the wisdom of dismissing an appeal where the judgment itself was little more than a formality, especially when the case has been fully briefed [and respondent has conceded that there is an appealable judgment]. . . . [I]f we were to dismiss this appeal, [appellants] would merely go back to superior court, obtain a judgment, and appeal again. This would result only in a complete waste of time. [¶] As a reviewing court, our task is to resolve appeals on the merits if at all possible. Therefore, . . .'we construe the order granting [the motion for judgment] to incorporate a judgment in the interests of justice and to avoid delay.' [Citation.]" (*Francis v. Dun & Bradstreet, Inc.* (1992) 3 Cal.App.4th 535, 539, fn. omitted; see also *Lieding v. Commercial Diving Ctr.* (1983) 143 Cal.App.3d 72, 74 [" '[w]hile the order [granting a motion for summary judgment] is nonappealable and the record does not disclose that any judgment was ever entered pursuant thereto, judicial expediency dictates that we reach the merits of the appeal and we therefore treat the order as a rendition of judgment"].)

*Standard of Review*

Since the motion for judgment is the functional equivalent of a motion for summary judgment, we apply the summary judgment standard of review. At oral argument respondent's counsel acknowledged that this is the correct standard of review. In their opening brief appellants impliedly concur with respondent. Appellants state, "As with a motion for summary judgment, this Court reviews the trial court's grant of design immunity under a *de novo* standard of review." Appellants contend that we must determine whether "triable issues of material fact are presented." They cite section 437c, the summary judgment statute.

8

" '[A] defendant moving for summary judgment based upon the assertion of an affirmative defense . . . "has the initial burden to show that undisputed facts support each element of the affirmative defense" . . . . If the defendant does not meet this burden, the motion must be denied.' [Citations.] [¶] ' "[T]here is no obligation on the opposing party . . . to establish anything by affidavit unless and until the moving party has by affidavit stated ' "facts establishing *every element* [of the affirmative defense] necessary to sustain a judgment in his favor . . . ." ' " ' " (*Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 467-468.) "[T]he burden shifts to the plaintiff to show there is one or more triable issues of material fact regarding the defense after the defendant meets the burden of establishing all the elements of the affirmative defense. [Citations.]" (*Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1484.)

"[W]e independently review the record that was before the trial court when it ruled on [respondent's] motion. [Citations.] In so doing, we view the evidence in the light most favorable to [appellants] as the losing parties, resolving evidentiary doubts and ambiguities in their favor. [Citation.]" (*Martinez v. Combs* (2010) 49 Cal.4th 35, 68.)

"We must presume the judgment is correct . . . ." (*Jones v. Department of Corrections and Rehabilitation* (2007) 152 Cal.App.4th 1367, 1376.) "On review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court. [Citation.] . . . '[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed.' [Citations.]" (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230.)

*Elements of Design Immunity*

"A public entity is liable for injury proximately caused by a dangerous condition of its property if the dangerous condition created a reasonably foreseeable risk of the kind of injury sustained, and the public entity had actual or constructive notice of the condition a

9

sufficient time before the injury to have taken preventive measures. [Citations.] However, a public entity may avoid such liability by raising the affirmative defense of *design immunity.* ([Gov. Code,] § 830.6.) A public entity claiming design immunity must establish three elements: (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design. [Citations.]" (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 66.) Unless a jury trial is waived, the establishment of the first two elements "requires a case-specific factual determination that must be left to the jury when there is conflicting evidence. [Citations.]" (*Hernandez v. Department of Transp.* (2003) 114 Cal.App.4th 376, 388.) "The third element of design immunity . . . must be tried by the court, not the jury." (*Cornette v. Department of Transportation, supra*, 26 Cal.4th at p. 66.) We analyze each of the design immunity elements.

*First Element*

Appellants contend that respondent failed to establish the first element of a causal relationship between the plan or design and the traffic accident. "[T]he injury-producing feature must have been a part of the plan approved by the governmental entity. [Citation.] The immunity only applies to 'a design-caused' accident. [Citation.]" (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 941, fn. omitted..)

The roadway was designed by plans approved in 1954, 1955, and 1959. Minor changes were made in 1966-1967 and the 1990s. The design plans did not call for the placement of a median barrier. Thus, the absence of a median barrier was part of the design. But appellants claim that the injury-producing feature was not the absence of a median barrier. Instead, it was a V-ditch in the median that was not part of any approved plan or design.

Appellants assert: "[Their] expert witness testified unequivocally that the upward slope of the V-ditch near the southbound roadway in the median that *caused the Jaime vehicle to flip*, thereby ejecting Jennifer Jaime, was **not** part of any design plan for the subject roadway. As such, the State was not entitled to design immunity." (First italics

10

added.) In other words, there was no causal relationship between the plan or design and the accident because the V-ditch caused the Mercedes to overturn and the V-ditch was not part of the plan or design. Appellants' counsel emphasized this point at oral argument in this court: "[F]or them [respondent] to get design immunity, you have to say there was a V-ditch there, we [respondent] thought about it, [and] we approved it . . . . "[I]f they can't show that it [the V-ditch] was part of the design, they can't get design immunity."

Appellants' expert, Dale Dunlap, testified that an unpaved, rough-graded "V-ditch . . . runs along the median . . . fairly close to the southbound inside shoulder." Dunlap used the term "V-ditch" because it is "a triangular channel" that "resembles the shape of a V." The purpose of the V-ditch is to promote "drainage control along the median." It "protect[s] the southbound lanes from [flooding.]" The V-ditch is approximately 18 feet away from the inside shoulder of the southbound roadway and 58 to 60 feet away from the inside shoulder of the northbound roadway. Jaime was driving in the number one northbound lane when his vehicle collided with the Honda.

In reviewing the plans for the roadway, Dunlap did not see any indication of the existence of the V-ditch in the median. He "would expect to see the flow line of the V-ditch in the set of plans." Dunlap opined, "[T]he V-ditch presents a nonrecoverable feature within the median that should be shielded by [a] median barrier." A nonrecoverable feature prevents a driver who leaves the roadway from recovering control of his vehicle.

Dunlap's testimony arguably constitutes prima facie evidence that the V-ditch was not part of the design or plan for the roadway. But appellants do not cite any evidence in the record supporting their assertion that the V-ditch "caused the [Mercedes] to flip, thereby ejecting Jennifer." In granting the motion for judgment, the trial court noted: "[I]t [the V-ditch] doesn't appear to have been the causal feature here." "I don't think it is possible to be persuaded that [the V-ditch] represented the danger [i.e., dangerous condition] if one existed here."

The mere existence of the V-ditch, without showing a triable issue of fact whether it caused the Mercedes to roll over, cannot defeat respondent's claim of design immunity. Respondent's expert, Nevin Sams, opined, "[T]he slopes are . . . not steep enough to cause a

11

vehicle to overturn." According to Sams, "there is a potential for the vehicle to roll" when the slope ratio reaches 3-to-1: a one-foot vertical drop for each three feet of horizontal distance. (The higher the ratio, the flatter the surface. A 4-to-1 ratio is flatter than a 3-to-1 ratio.) Sams testified that the portion of the median where the accident had occurred "was a recoverable area." He estimated that the slope ratio was no steeper than 8-to-1.

Dunlap testified: "[T]esting has shown that anything steeper than 4-to-1 is nonrecoverable, a 4-to-1 ratio or flatter generally is [recoverable] . . . ." Based on photographs of the median, Dunlap estimated that, after leaving the northbound roadway, the median "probably gets up to a five or 6-to-1 slope, *and then it starts to flatten out* as you get further away from the northbound lanes and closer to the southbound lanes, to where it finally reaches the flow line of the V-ditch. And then, the grade . . . reverses, and travels at about a 10-to-1 slope upwards towards the southbound lanes." (Italics added.) On cross-examination, Dunlap said it was his "estimation" that the slopes "are 5-to-1 and 6-to-1 and 10-to-1." He had not seen any slope as steep as 4-to-1.

Pursuant to Dunlap's testimony, the slope ratios in the median were higher, and therefore flatter, than the 4-to-1 ratio that "testing has shown" to be generally recoverable. Appellants do not cite any facts in the record supporting Dunlap's opinion that the V-ditch nevertheless was a nonrecoverable slope. "Plaintiffs cannot manufacture a triable issue of fact through use of an expert opinion with self-serving conclusions devoid of any basis, explanation, or reasoning. [Citation.]" (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1106.)

In any event, appellants' complaints established a causal relationship between the plan or design for the roadway and the traffic accident. "The complaint limits the issues to be addressed at the motion for summary judgment. The rationale is clear: It is the allegations in the complaint to which the summary judgment motion must respond. [Citation.]" (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258.) To show that "the accident was caused by a design defect, and not some other cause," respondent "may rely on the allegations of the complaint to establish causation. [Citation.]" (*Alvis v. County of Ventura* (2009) 178 Cal.App.4th 536, 550.) A complaint's factual allegations "constitute

12

judicial admissions. [Citations.]" (*Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 222, fn. 3.)

Appellants' complaints make clear that the design feature that caused the accident was the absence of a median barrier. Appellants alleged that the absence of a median barrier constituted a dangerous condition because there was nothing "to prevent vehicles from crossing from one side of the roadway to the other." The complaints did not mention the V-ditch, the slope of the median, or any other aspect of the median's topography. Jaime alleged that respondent's failure to construct a median barrier "was violative of [its] guidelines and standards for the placement of center dividers, walls and or/guardrails due to the potential for *head on collisions* between drivers traveling in opposite directions." (Italics added.) Jaime referred to the danger that vehicles entering the median would "lose control and roll over." But he attributed the rollover of his vehicle to soft dirt in the median, not to a nonrecoverable slope. Jaime alleged that his "car slid sideways and rotated in a counterclockwise motion until the right side tires of [his] car dug into the soft dirt *causing* [his] car to overturn across both lanes of southbound US-101." (Italics added.) Appellants did not contend in their complaints, as they contend in their opening brief, that "the design feature of the median that caused Jaime's vehicle to flip . . . was the abrupt change in slope in the median, which was due to a 'V-ditch' in the median for drainage."

Appellants did not move to amend their complaints to allege that the V-ditch caused Jaime's vehicle to roll over. "Upon a motion for summary judgment, amendments to the pleadings are readily allowed. [Citation.] If plaintiff wishes to expand the issues presented, it is incumbent on plaintiff to seek leave to amend the complaint either prior to the hearing on the motion for summary judgment, or at the hearing itself. [Citation.]" (*Laabs v. City of Victorville*, *supra*, 163 Cal.App.4th at p. 1258.) "To allow an issue that has not been pled to be raised in opposition to a motion for summary judgment in the absence of an amended pleading, allows nothing more than a moving target. For Code of Civil Procedure section 437c to have procedural viability, the parties must be acting on a known or set stage." (*Id*., at p. 1258, fn. 7.) "Thus, a 'defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or

13

her opposing papers.' [Citation.]" (*Id*., at p. 1253.) "Having repeatedly set forth [in their complaints] the allegation" that the accident was caused by the absence of a median barrier, appellants are not "entitled to change course in response to a summary judgment motion and argue" that the actual cause was a V-ditch in the median. (*Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1326.)

*Second Element*

Government Code section 830.6 defines the second element as consisting of either of two parts: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where [first part] such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where [second part] such plan or design is prepared in conformity with standards previously so approved . . . ."

"A detailed plan, drawn up by a competent engineering firm, and approved by a city engineer in the exercise of his or her discretionary authority, is persuasive evidence" of the first part of the second element: prior discretionary approval. (*Grenier v. City of Irwindale*, *supra*, 57 Cal.App.4th 931, 940.) Appellants contend that respondent did not establish the requisite prior approval because it "failed to provide the trial court with complete copies of the relevant plans, and the trial court permitted [respondent's] sole witness [Nevin Sams] to testify about matters for which he knew nothing only three (3) days prior at his deposition." Appellants continue, "This testimony should have been excluded, and the documents relied upon by [respondent] should have been deemed unreliable." Appellants present no legal or factual analysis explaining (1) why the plan documents provided by respondent should have been "deemed unreliable" because they were incomplete,[3] and (2) why Sams' testimony should have been excluded because it differed from what he had said at his deposition. Appellants have therefore forfeited these issues. (*Salehi v. Surfside III Condominium Owners' Assn.* (2011) 200 Cal.App.4th 1146, 1161-1162.)

---

[3] Nevin Sams testified that the missing pages of the 1954 plan concerned "components . . . not in the area of the subject location."

14

Appellants argue that respondent "failed to produce certified copies [of the plan documents] pursuant to California Evidence Code § 1530." When appellants raised this issue below, the trial court responded, "[T]hese are plans being produced by . . . a state agency, so that the presumption of [Evidence Code section] 1530 applies and a certified copy would not be required." Appellants have not presented any legal argument showing that the trial court erred. "We therefore deem any claim of error forfeited. [Citations.]" (*Mendez v. Mid-Wilshire Health Care Center.* (2013) 220 Cal.App.4th 534, 547-548.)

Appellants assert that the "Date Completed" sections of the 1954 and 1957 plans were "left blank, which raised a question of whether the project was actually completed at that point." The blank sections also "raised doubts as to whether these plans were, in fact, the actual final as-built plans." But Nevin Sams testified that the "Date Completed" sections were usually not filled in "on the older projects." Moreover, discretionary approval of the plan or design "simply means approval *in advance* of construction by the legislative body or officer exercising discretionary authority." (*Ramirez v. City of Redondo Beach* (1987) 192 Cal.App.3d 515, 526, italics added.) The plans' omission of the date of completion of the project does not raise a triable issue of material fact whether approval for the project was given in advance of construction.

Appellants contend that they had "asked the Court to prohibit Mr. Sams from offering testimony about these plans because he . . . did not know who had signed the plans or what their titles were." Appellants argue that the "signatures relied upon by [respondent] were, therefore, inherently unreliable."

The argument lacks merit. At the hearing on the motion for judgment, Sams testified that he knew the names and titles of the persons who had signed the plans approved in 1954 and 1955. They were "E.J.C. Peterson, the District Engineer"; "J.C. Young, Engineer of Design"; "G.T. McCoy, State Highway Engineer"; "Frank Durkee, . . . the Director of Public Works"; and E. Withycomde, "the Assistant State Highway Engineer." Sams also recited the names and titles of the officials who had signed the plans approved in 1959. Sams opined that the signers of the plans had "the discretionary authority to preapprove the design plans."

15

In any event, "[a] signature is presumed to be genuine and authorized if it purports to be the signature, affixed in his official capacity, of . . . [¶]  (b)  [a] public employee of any public entity in the United States."  (Evid. Code, § 1453, subd. (b).)  Because the signatures purport to be signatures of public officials affixed in their official capacities, they are presumed to be genuine and authorized.  Appellants have not cited any evidence in the record that rebuts this presumption.  "Given this presumption, the signatures of the various Caltrans engineers, affixed in their official capacity as employees of the State, furnishes 'evidence sufficient to sustain a finding' that the writings were what the State claimed them to be.  [Citation.]  Thus, the plans themselves provide evidence that the Project design was given the requisite discretionary approval prior to construction."  (*Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 728-729, disapproved on other grounds in *Cornette v. Dept. of Transp.*, *supra*, 26 Cal.4th at p. 74 & fn. 3.)

Irrespective of whether respondent satisfied the first part (prior discretionary approval) of the second element, it satisfied the second part, which applies "where such plan or design is prepared in conformity with standards previously . . . approved."  (Gov. Code, § 830.6.)  Nevin Sams testified that, when the divided roadway was constructed in the 1950s, there were no state standards for median barriers.  Starting in 1960, state standards provided that median barriers were not warranted if the minimum median width was 36 feet.  From 1965 through 1989, the minimum median width varied between 45 and 50 feet.  The median width at the location of the instant traffic accident was 76 feet.

State standards for median barriers recognize that barriers have disadvantages as well as advantages.  " 'Median barriers result in a trade-off.  They prevent nearly all cross-median accidents, but usually result in an overall increase in accidents and injuries.  A median barrier is a fixed object which, when hit, can cause serious injury either by direct impact or by deflecting vehicles back into traffic.  In addition, a barrier eliminates half the recovery area for out-of-control vehicles.  Based on studies of the effectiveness of median barrier placement, California has developed a median barrier policy.  The policy reflects the fact that as traffic volumes rise, the chance that an errant vehicle will cross the median and strike an opposing vehicle increases.  But as the median reaches a certain width, it is less likely

16

that those events will occur.  With medians 46 feet or wider, regardless of traffic volume, the benefits of preventing cross-median accidents and injuries by barrier placement are outweighed by the disadvantages of the accidents and injuries generated by a barrier.   The only exception to this rule is at those locations where there is a demonstrable history of excessive cross-median accidents . . . ."  (*Mirzada v. Department of Transportation* (2003) 111 Cal.App.4th 802, 804.)

   Respondent's 2008 Traffic Manual provides that, regardless of median width, "barriers should be considered if there has been a high rate of out-of-control cross-median accidents involving opposing vehicles.  A rate based on at least three accidents in 5 years, or .5 cross-median accidents per mile per year of any severity, or .12 fatal cross-median accidents per mile per year involving opposing vehicles justifies analysis to determine the advisability of a barrier."  Sams testified that the roadway where the instant accident occurred has never met the requisite "high rate of out-of-control cross-median accidents." Sams noted that, during a 9.25-year period ending the day before the accident in April 2010, "over 131,000,000 vehicles traveled through the subject area with just . . . one cross-median accident."

   In their reply brief, appellants observe that in 2006 Sams recommended that a median barrier be constructed on U.S. Route 101 for the approximately two-mile section between the Clark Avenue overcrossing and the Santa Maria Way undercrossing.  This was the section of U.S. Route 101 where the accident occurred.  At the time of his recommendation, Sams was employed by respondent as a district traffic safety engineer.  In his recommendation, Sams said that "[t]he majority of the median is on a non-recoverable slope reducing the effective median width to 25-30 feet."  At the hearing on the motion for judgment, Sams clarified that the non-recoverable slope "starts about 600 feet north of the subject accident, and then goes a mile towards the Santa Maria Way undercrossing."  Sams wanted to continue the barrier to the Clark Avenue overcrossing "to achieve a logical termination point."  He had no concern about the topography at the site of the accident. Sams testified: "It is relatively flat there with approximately a 10-to-1 slope in the median. The roadbeds are very much close to being equal to each other as far as height."

17

*Third Element*

The third element of design immunity is that the public entity must present "substantial evidence supporting the reasonableness of the plan or design." (*Cornette v. Department of Transportation*, *supra*, 26 Cal.4th at p. 66.) "We are not concerned with whether the evidence of reasonableness is undisputed; the statute provides immunity when there is substantial evidence of reasonableness, even if contradicted. [Citation.]" (*Grenier v. City of Irwindale*, *supra*, 57 Cal.App.4th at p. 940.) Thus, "[s]ummary judgment on the ground of design immunity cannot be defeated by the creation of evidentiary conflicts as to reasonableness." (*Id*., at pp. 941-942.) "Approval of the plan by competent professionals can, in and of itself, constitute substantial evidence of reasonableness. [Citation.]" (*Id*., at p. 940.)

Appellants contend that respondent failed to present the requisite substantial evidence, but their contention is not supported by meaningful legal and factual analysis with record references. Accordingly, the contention is forfeited. (*Salehi v. Surfside III Condominium Owners' Assn.*, *supra*, 200 Cal.App.4th at pp. 1161-1162.)

*Loss of Design Immunity*

Appellants claim that respondent lost its design immunity. "To demonstrate loss of design immunity a plaintiff must . . . establish three elements: (1) the plan or design has become dangerous because of a change in physical conditions; (2) the public entity had actual or constructive notice of the dangerous condition thus created; and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or the public entity, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably attempted to provide adequate warnings. [Citations.]" (*Cornette v. Department of Transportation*, *supra*, 26 Cal.4th at p. 66.)

"[Appellants] bore the burden of production in opposition to the motion for summary judgment 'to make a prima facie showing of the existence of a triable issue of material fact' [citation] with respect to the loss of the design immunity. Since it is necessary to establish all three elements of the loss of the design immunity [citation], [appellants] needed to make

a prima facie showing of the existence of a triable issue of fact with respect to each of those elements to overcome [respondent's] motion for summary judgment." (*Mirzada v. Department of Transportation*, *supra*, 111 Cal.App.4th at pp. 806-807.)

Appellants have not referred us to evidence in the record raising a triable issue of material fact concerning the first element: the plan or design omitting a median barrier became dangerous because of a change in physical conditions. In support of the first element, appellants cite only two factors: (1) the trial court's remark that "a significant change" occurred when the roadway became a freeway because the change "should have had some effect on speed limits and how they are enforced," and (2) Dunlap's testimony "that the average daily traffic in 1964 was 10,000 while it had increased to 40,000 by 2006." Appellants do not explain how these changes made it dangerous not to erect a barrier along the 76-foot wide median. Because appellants were required to make a prima facie showing of a triable issue of material fact with respect to each of the three elements, we need not consider the second and third elements.

*Disposition*

The judgment is affirmed. Respondent shall recover its costs on appeal.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:



GILBERT, P.J.



PERREN, J.


19

Jed Beebe, Judge

Superior Court County of Santa Barbara

_____

Michael Alder, Jennifer P. Burkes and Jefferson Saylor, for Appellants.

Jeanne Scherer, Acting Chief Counsel, California Department of Transportation, David Gossage, Deputy Chief Counsel, Lucille Y. Baca and Karl H. Schmidt, Assistants Chief Counsel and Stacy J. Lau, Deputy Attorney, for Respondent.